MESCH, CLARK & ROTHSCHILD, P.C.
259 North Meyer Avenue
Tucson, Arizona 85701
Phone: (520) 624-8886
Fax: (520) 798-1037
Email: mmcgrath@mcrazlaw.com
         knye@mcrazlaw.com
By:    Michael McGrath, #6019
        Kasey C. Nye, #20610

BROWNSTEIN HYATT FARBER
SCHRECK, LLP
410 Seventeenth Street, Suite 2200
Denver, CO 80202-4432
Phone: (303) 223-1100
Fax: (303) 223-1111
Email: mpankow@bhfs.com
        jhantman@bhfs.com,
By:    Michael J. Pankow, Co. #21212
        Joshua M. Hantman, Co. #42010

Proposed Attorneys for Debtors

## UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br>REGIONAL CARE SERVICES CORP.,<br>        Debtor. | Chapter 11 Proceedings<br><br>No. 4:14-bk-01383-EWH |
| In re:<br>CASA GRANDE COMMUNITY<br>HOSPITAL D/B/A CASA GRANDE<br>REGIONAL MEDICAL CENTER,<br>        Debtor. | No. 4:14-bk-01384-BMW |
| In re:<br>REGIONAL CARE PHYSICIAN'S<br>GROUP, INC.,<br>        Debtor. | No. 4:14-bk-01385-EWH |
| In re:<br>CASA GRANDE REGIONAL<br>RETIREMENT COMMUNITY,<br>        Debtor. | No. 4:14-bk-01386-EWH |

**EMERGENCY MOTION FOR ENTRY OF STIPULATED INTERIM ORDER (I) GRANTING INTERIM USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 363 AND 507, AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b)**

Regional Care Services Corp. ("**RCSC**"), Casa Grande Community Hospital d/b/a

Casa Grande Regional Medical Center ("**CGRMC**"), Regional Care Physician's Group,

Inc. ("**RCPG**"), and Casa Grande Regional Retirement Community ("**CGRRC**")

(collectively, the "**Debtors**"), in the above captioned reorganization cases ("**Reorganization Cases**") hereby move, pursuant to sections 361, 363 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-4 of the Local Bankruptcy Rules, for the entry of the Stipulated Interim Order attached hereto as **Exhibit A** (the "**Interim Order**"), (I) authorizing the Debtors to use Cash Collateral (as defined below and pursuant to Bankruptcy Code § 363(a)), (II) granting adequate protection to the Trustee (as defined below), and (III) scheduling a final hearing (the "**Final Hearing**") to consider granting the relief requested on a final basis.

The Interim Order evidences the stipulation between the Debtors and Wells Fargo Bank, National Association, as Trustee, related to the terms and conditions of adequate protection, financial reporting, and the use of the Trustee's Cash Collateral.

This Motion seeks immediate entry of an order granting the Motion and is brought on an emergency basis on expedited notice under Bankruptcy Rule 2002 to avoid immediate and irreparable harm to the Debtors' estates.

The Debtors, one of the largest employers in Pinal County, operate an award winning, full service non-profit community hospital serving more than 65,000 patients each year from the largely rural communities of Casa Grande, Sacaton, Eloy, Florence and surrounding communities.  Changes in reimbursements from Arizona's Medicaid program, Arizona Health Care Cost Containment System, resulted in a decline in the Debtors' revenue in excess of $10 million annually.  The decline in revenue threatened the Debtors ability to service its $65 million of bond obligations while providing the same level of high quality services.  After pursuing several restructuring options, the Debtors filed these cases in order to confirm a plan of reorganization ("**Plan**") that will effectuate the sale of substantially all of the Debtors' assets to Banner Health ("**Banner**"), a non-profit health system headquartered in Phoenix, Arizona that operates 24 hospitals and health care facilities in Alaska, Arizona, California, Colorado, Nebraska,

Nevada and Wyoming

In the sale transaction, Banner will pay to the Debtors *up to $87 million dollars to pay allowed claims, or such lesser amount needed to pay all such claims in full,* through the Plan. Confirmation of the Plan will also continue CGRMC's commitment to providing quality health care to the Casa Grande community and surrounding areas in a caring and compassionate environment its creditors, its employees and the community the Debtors serve.

Additional background on the Debtors and the events leading to the filing of these cases is set forth in the Omnibus Declaration of Rona Curphy in Support of Debtors' Chapter 11 Petitions and First Day Motions ("**Curphy Declaration**") filed contemporaneously herewith and incorporated herein by reference.

The Debtors have filed First-Day Motions intended to facilitate a smooth transition into Chapter 11 with as little disruption as possible for patients and medical personnel and to lay the ground work for an orderly confirmation process, and to position the Debtors' operations for an orderly transition to Banner Health. By this Motion the Debtors are asking the Court to approve a stipulation with its bondholders allowing continued use of cash collateral. Without immediate access to Cash Collateral, the Debtors' ability to operate, provide medical services to the public, and preserve the value of their businesses will be immediately and irreparably jeopardized, resulting in significant harm to the Debtors' estates and creditors. Based on the foregoing, the Debtors submit that the interim relief requested in this Motion, pending a final hearing, is necessary, appropriate and fully warranted, and is essential to avoid immediate and irreparable harm to the Debtors and their estates and creditors.

This Motion is supported by the attached Memorandum of Points and Authorities,

///
///

1    the testimony in the contemporaneously filed Curphy Declaration and the entire record in

2    these cases.

3    Dated: February 4, 2014.                    BROWNSTEIN HYATT FARBER
                                                  SCHRECK, LLP
4                                                     Michael J. Pankow
                                                      Joshua M. Hantman
5
6                                                      -AND-

7                                                 MESCH, CLARK & ROTHSCHILD, P.C.

8
9                                               By:    s/Kasey C. Nye, #20610
                                                      Michael McGrath
10                                                    Kasey C. Nye
                                                      *Proposed Attorneys for Debtors*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. JURISDICTION

1. This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this case and this motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 361, 363 and 507 of the Bankruptcy Code, and Bankruptcy Rule 4001.

## II. FACTUAL BACKGROUND

### A. The Debtors

2. On February 4, 2014, (the "**Petition Date**"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue in possession of their property and manage their business as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. To date, there has been no official committee of unsecured creditors appointed.

3. RCSC is an Arizona non-profit corporation that is exempt from federal income taxation under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended. RCSC was incorporated in 1997 for charitable and educational purposes. RCSC is the sole member of CGRMC, RCPG and CGRRC. The RCSC's board of directors consists of five members (four independent members and one physician). As of the Petition Date, RCSC' management consists of a Rona Curphy as President, Karen Francis as Chief Financial Officer, and John Robert McEvoy as Secretary/Treasurer.

4. CGRMC is a 177-licensed bed, general acute care hospital located in Casa Grande, Arizona. CGRMC is an Arizona non-profit corporation that is exempt from federal income taxation under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended. CGRMC was incorporated in November 1981. It's sole member is RCSC. CGRMC manages all operations and collections for the Debtors. CGRMC is also the signatory for all of the hospital's equipment and capital leases.

5

5.      RCPG is an Arizona non-profit corporation that is exempt from federal income taxation under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended. RCPG was incorporated in 2008 to provide medical services, medical programs and health care for the benefit of patients in the Casa Grande, Arizona service area. RCPG employs the physicians who serve the Hospital, and were formerly been under CGRMC's operations. As of the Petition Date, RCPG's management consists of Rona Curphy, as President and Chief Executive Officer, and Karen Francis as Chief Financial Officer. RCPG currently employs six physicians. They include one neurologist, one OB/GYN physician, one GYN physician, two general surgeons, and one general/vascular surgeon.

6.      CGRRC is an Arizona non-profit corporation that is exempt from federal income taxation under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended. CGRRC was incorporated in 1989 to provide housing facilities and other services specially designed to meet specific physical, social, and psychological needs of elderly and handicapped persons. CGRRC's central purpose also includes support for charitable, educational, and other exempt activities of CGRMC and Central Arizona Medical Center. CGRRC is the borrower on the loan for the urgent care building utilized under hospital operations, but there has been no activity in this entity since 2005. As of the Petition Date, CGRRC's management consists of Rona Curphy as President, Cherie McGlynn as Chairman, David Fitzgibbons as Vice Chairman, and John Robert McEvoy as Secretary/Treasurer.

**B.      The Bond Financing Documents**

7.      As set forth in the Curphy Declaration, Casa Grande is obligated on the following bond financing documents in the aggregate principal amount of approximately $63.8 million (collectively, the "**Bond Financing Documents**"):

(a)      a certain Master Indenture of Trust dated July 1, 2001 (as supplemented and amended, the "**Master Indenture**"), by and between Casa

6

Grande and Wells Fargo Bank, National Association,[1] not individually, but as master trustee (the "**Master Trustee**");

(b) certain "Obligations" (as defined in the Master Indenture), in the form of promissory notes, made by Casa Grande pursuant to the Master Indenture;

(c) a certain Bond Indenture, dated July 1, 2001 (as supplemented and amended, the "**Bond Indenture**"), by and between the Industrial Development Authority of the City of Casa Grande (the "**Authority**") and Wells Fargo Bank, National Association, not individually, but as bond trustee (the "**Bond Trustee**" and, together with the Master Trustee, the "**Trustee**");

(d) a certain Deed of Trust and Assignment of Rents with Security Agreement dated August 1, 2001 (as supplemented and amended, the "**Deed of Trust**"), pursuant to which Casa Grande granted a lien on its interest in the "Casa Grande Hospital Site," all "Buildings and Improvements" thereon, all "Collateral," and all "Fixtures" (each as defined in the Deed of Trust) (to the extent such liens are valid, enforceable, perfected and unavoidable, the "**Prepetition Collateral**");

(e) those certain Hospital Revenue Refunding Bonds (Casa Grande Regional Medical Center), Series 2001A (the "**2001A Bonds**"), issued pursuant to the Bond Indenture in the initial aggregate principal amount of $41,845,000;

(f) those certain Hospital Revenue Refunding Bonds (Casa Grande Regional Medical Center), Series 2001B (the "**2001B Bonds**") issued pursuant to the Bond Indenture in the initial aggregate principal amount of $4,645,000;

(g) those certain Hospital Revenue Bonds (Casa Grande Regional Medical Center) Series 2002A (the "**2002A Bonds**" and, together with the 2001A

---

[1] Wells Fargo Bank Arizona, National Association was the original master trustee under the Master Indenture. Wells Fargo Bank Arizona, National Association thereafter changed its name to Wells Fargo Bank, National Association.

Case 4:14-bk-01383-EWH    Doc 6    Filed 02/04/14    Entered 02/04/14 20:01:40    Desc
Main Document    Page 7 of 33

Bonds and the 2001B Bonds, the "**Bonds**") issued pursuant to the Bond Indenture in the initial aggregate principal amount of $25,475,000; and

(h)     a certain Loan Agreement dated July 1, 2001 (as supplemented and amended, the "**Loan Agreement**"), by and between the Authority and Casa Grande, pursuant to which Casa Grande covenanted to make payments at such times and in such amounts so as to provide for the payment of the principal of, premium, if any, and interest on the Bonds and any fees, costs and expenses related thereto (collectively, the "**Prepetition Obligations**").

8.     Pursuant to the Bond Financing Documents, certain accounts were established and are held in trust by the Trustee for the benefit of the holders of the Bonds (collectively, the "**Trustee-Held Funds**"), including, without limitation, (i) a certain "Revenue Fund", (ii) a certain "Interest Account", (iii) a certain "Principal Account", and (iv) a certain "Bond Reserve Account" (each as defined in the Bond Indenture). The Trustee believes that the Trustee-Held Funds are not property of the Debtors' estates. The Debtors acknowledge that the Trustee holds a validly perfected possessory security interest in the Trustee-Held Funds, and is entitled to access the Trustee-Held Funds in accordance with the Bond Financing Documents. As such, the Debtors are not seeking authority to use the Trustee-Held Funds pursuant to the Motion or Interim Order.

9.     To the extent Prepetition Collateral includes negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents in the possession, custody or control of Casa Grande, it is cash collateral for purposes of the Motion (as defined in section 363(a) of the Bankruptcy Code, the "**Cash Collateral**").[23]

---

[2] For the avoidance of doubt, the term "Cash Collateral" does not include Trustee-Held Funds for purposes of the Motion and Interim Order.

[3] A vendor to the Debtor, Cardinal Health, has filed a UCC-1 financing statement asserting a security interest in, among other things, the Debtors' accounts and thus cash. However, the security agreement(s) in the Debtors' records do not grant a security interest in accounts. After several requests by the Debtors, Cardinal Health provided a security agreement purporting to grant an interest in the Debtors' accounts to counsel for the Debtors immediately prior to the filing of these Cases. The Debtors have not yet evaluated the security agreement. However, for purposes of seeking entry of the Interim Order, the Debtors do not believe an evaluation is necessary. Specifically,

# III. SUMMARY OF MATERIAL PROVISIONS OF THE INTERIM ORDER

10.     A summary of the material terms and conditions governing the Debtors' proposed use of Cash Collateral, as contained in the Interim Order, is as follows:[4]

(a)     **Use of Cash Collateral.** The Debtors are permitted to use Cash Collateral pursuant to the budget attached to the Interim Order (the "**Budget**"), subject to certain permitted variances, pending a final determination by the Court or termination of the Interim Order pursuant to its terms.

(b)     **Reporting.** No later than Friday of each week (or if such day is not a Business Day, the next succeeding Business Day), the Debtors will submit to the Trustee or its advisors (a) a cash flow report setting forth the Debtors' actual performance for the immediately preceding week and a comparison of the actual performance for such week against the forecast for such week in the Budget, in each case with written explanations of material variances, and (b) a flash report of key performance metrics for the immediately preceding week (i.e., average daily census, emergency room visits, urgent care visits, observations, births, and, every two weeks, total paid FTEs and total productive FTEs).

(c)     **Adequate Protection.** To the extent of any diminution in the value of the Trustee's Prepetition Collateral, including the Cash Collateral, from and after the Petition Date, adequate protection will be provided to the Trustee in the form of:

(1)     senior priority replacement liens upon all assets and property of the Debtors and their respective estates of any kind or nature whatsoever, now existing or hereafter acquired, including, without limitation, the Prepetition Collateral, but excluding all avoidance claims and causes of action, and the products and proceeds thereof (the "**Replacement Liens**"); which Replacement Liens shall be

a.     valid, perfected, enforceable and effective as of the Petition Date without any further action of the Debtors or the Trustee; and

---

the Debtors' books and records indicate that Cardinal Health has a claim in the amount of approximately $1.1 million, but the Debtors' cash will not dip below that amount in the interim period. Accordingly, to the extent Cardinal Health does have an interest in the Debtors' cash collateral, such interest will not be at risk during the interim period.

[4] The Summary is intended to provide a description of certain material terms of the Interim Order. It is not exhaustive. *See* the Interim Order for its complete terms and provisions. In the event of any inconsistency between the summary set forth in this motion and the Interim Order, the terms of the Interim Order shall control. Interested parties should review the Interim Order for a complete and accurate understanding of its terms.

9

b. subject and subordinate to (a) the Carve-Out (defined below), (b) validly perfected liens or security interests senior to the liens and security interests of the Trustee with respect to Casa Grande's assets and properties as of the Petition Date (the "**Prior Senior Liens**"), and (c) any administrative claim granted to Banner in these cases (the "**Banner Administrative Expense Claim**");

(2) a "super-priority" administrative expense claim pursuant to bankruptcy Code 507(b), subject to expenditures constituting the Carve-Out and the Banner Administrative Expense Claim (the "**Super-Priority Administrative Claim**"); and

(3) payment of the reasonable fees and expenses of the Trustee and its professionals pursuant to the Budget and otherwise through deductions made by the Trustee or its professionals from (a) any expense retainers funded by the Debtors prior to the Petition Date and/or (b) the Trustee-Held Funds in accordance with the Bond Financing Documents.

(4) to the extent that the automatic stay otherwise applies to the Trustee-Held Funds pursuant to Bankruptcy Code Section 362(a), as adequate protection for the use of the Trustee's Cash Collateral, the Debtors stipulate to relief from such stay for the limited purpose of allowing the Trustee to administer and apply the Trustee-Held Funds in accordance with the Bond Financing Documents.

(d) **Carve-Out.** The carve-out shall include (i) fees payable to the U.S. Trustee and Clerk of the Court and (ii) unpaid fees and expenses of professionals retained by the Debtors or an unsecured creditors' committee (as more specifically defined in the Interim Order, the "**Carve-Out**")

(e) **Restrictions.** Cash Collateral may not be used to prosecute actions, claims, demands or causes of action against the Trustee, or to object to or contest in any manner, or to raise any defense in any pleading to the validity, perfection, priority or enforceability of the Trustee's liens and security interests against the Prepetition Collateral or the Replacement Liens.

(f) **Section 522(b).** In light of its agreement to subordinate its liens and super-priority claims and permit use of its Cash Collateral, as set forth in the Interim Order and above, the Trustee shall be entitled to all of the rights and benefits of Bankruptcy Code § 522(b).

(g) **Parties in Interest's Ability to Challenge; Release.** Parties in interest shall have 28 days after entry of a final order to bring any action challenging validity, enforceability or priority of the Prepetition Debt (as defined

Case 4:14-bk-01383-EWH    Doc 6    Filed 02/04/14    Entered 02/04/14 20:01:40    Desc
Main Document    Page 10 of 33

therein) or the liens on the Prepetition Collateral in respect thereof, or otherwise assert claims or causes of action against the Trustee on behalf of the Debtors' estate. If no such adversary proceeding or contested matter is commenced as of such date, then, among other things, parties in interest shall be barred from bringing such proceedings and shall be bound by the terms of the Interim Order, and the Trustee shall receive a full release.

(h)     **Events of Default.**  The Interim Order contains several events of default with respect to the Debtors' authorization to use Cash Collateral (as defined in the Interim Order, the "**Events of Default**").

## IV.     BASIS FOR RELIEF

11.     Use of Cash Collateral is critical to the Debtors' operations and ability to fund these chapter 11 cases pending the anticipated Sale, which is expected to yield a purchase price that will pay all allowed claims in these cases in full. The Sale will also ensure that the Debtors and their operations remain going concerns, employees' jobs are secured, medical services continue to be provided in Casa Grande, Arizona uninterrupted, and patients' interests are satisfied.

12.     The Debtors have an immediate need to access capital in order to sustain operations through Sale and administer these Cases. Without such capital, the Debtors would not be able to fund these Cases or pay for the services and expenses necessary to preserve and maximize the value of the Assets. Indeed, absent sufficient funding to support their businesses, the Debtors' ability to consummate the Sale will be significantly hampered, if not completely destroyed, and the value of the Assets will quickly erode. Entry of the Interim Order approving use of Cash Collateral is thus not only necessary, it will help maximize ultimate recovery for creditors through the Sale.

**A.      The Court Should Approve the Motion Because the Trustee Has Consented to the Debtors' Use of Cash Collateral Pursuant to the Terms and Conditions of the Interim Order**

13.      Bankruptcy Code § 363(c)(2) provides that a "trustee may not use, sell or lease cash collateral . . . unless (A) each entity that has an interest in such cash collateral consents; or (B) the Court, after notice and hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

14.      The Interim Order is a stipulated order between the Debtors and the Trustee representing the result of the parties' good-faith, arms' length negotiations regarding the Debtors' use of Cash Collateral.  Pursuant to the terms and conditions thereof, and the Budget attached thereto, the Trustee has expressly consented to the Debtors' use of Cash Collateral and the proposed adequate protections, as evidenced by the Trustees' signature thereto.   Accordingly, Bankruptcy Code § 363(c)(2) is satisfied.

**B.      The Trustee Will Be Adequately Protected**

15.      Bankruptcy Code § 363(e) provides, in relevant part:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest. . . .

16.      The Bankruptcy Code does not explicitly define "adequate protection," but § 361 does provide the means by which a debtor may provide adequate protection, including (i) cash payments, (ii) an "additional or replacement lien" to the extent use of Cash Collateral results in a decrease in the value of such entity's interest in such property, and (iii) granting such "other relief" resulting in the "indubitable equivalent of such entity's interest in such property."  11 U.S.C. § 361.  What constitutes adequate protection is a question of fact that must be evaluated on a case by case basis.  *In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (citing *In re O'Conner*, 808 F.2d 1393, 1396-97 (10th Cir. 1987); *In re Martin*, 761 F.2d 472, 476 (8th Cir. 1985).

17.     The purpose in providing "adequate protection" is to ensure the creditor receives the value for which the creditor bargained pre-bankruptcy. *In re O'Connor*, 808 F.2d at 1396.  Adequate protection is intended to protect secured creditors from diminution in value from the debtor's use of the collateral during administration of the case.  *See In re Kain*, 86 B.R. 506, 513 (W.D. Mich. 1988); *In re Becker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986). The protection afforded a creditor whose cash collateral is permitted by the Bankruptcy Court to be used by a debtor-in-possession is whatever condition is deemed necessary to provide adequate protection of the creditors' interest.  *In re Quality Beverage Co., Inc.*, 181 B.R. 887, 896 (Bankr. S.D. Tex, 1995); *In re J.K.J. Chevrolet, Inc.*, 190 B.R. 542, 545 (Bankr. E.D. Va. 1995).

18.     The Trustee has explicitly consented to the adequate protections proposed in the Motion and set forth in the Interim Order.  Moreover, the proposed adequate protections are reasonable, appropriate and sufficient to satisfy the standard of "adequate protection" and maintain the value of the Prepetition Collateral.  *See In re Center Wholesale, Inc.*, 759 F.2d 1440, 1450 (9th Cir. 1985); *In re Swedeland Dev. Group, Inc.*, 16 F.3d at 564; *In re Becker Indus. Corp.*, 58 B.R. at 736.  Accordingly, the Trustee will be properly and adequately protected.

**C.      The Debtors Will Suffer Immediate and Irreparable Harm if They Cannot Use Cash Collateral on an Interim Basis**

19.     Rule 4001(b)(2) of the Federal Rules of Bankruptcy Procedure provides:

> The court may commence a final hearing on a motion for authorization to use cash collateral no earlier than 14 days after service of the motion.  If the motion so requests, the court may conduct a preliminary hearing before such 14 day period expires, but the court may authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

20.     Immediate access to Cash Collateral is critical to the Debtors' operations and their ability to provide medical services to the public and make it to Sale.  Interim

Case 4:14-bk-01383-EWH    Doc 6    Filed 02/04/14    Entered 02/04/14 20:01:40    Desc
Main Document       Page 13 of 33

Cash Collateral is needed for, among other things, (i) hospital operations, (ii) patient care, (iii) funding payroll for doctors, nurses and other staff, (iv) purchasing medical supplies and pharmaceuticals, (v) paying for blood supplies, (vi) maintaining utilities, (vii) paying vendors critical to operations, and (viii) administering these cases. Without immediate access to Cash Collateral, the Debtors' ability to preserve the value of their businesses and Assets will be immediately and irreparably jeopardized, resulting in significant harm to the Debtors' estates and creditors.

21. To meet these immediate needs, the Debtors seek authorization on an interim basis to use Cash Collateral in accordance with the terms and conditions of the Interim Order and the Budget attached thereto. Based on the foregoing, the Debtors submit that the interim relief requested in this Motion, pending a final hearing, is necessary, appropriate and fully warranted, and is essential to avoid immediate and irreparable harm to the Debtors and their estates and creditors..

## V. NO PRIOR REQUEST

22. The Debtors have not previously sought the relief requested herein from this or any other court.

## VI. CONCLUSION AND RELIEF REQUESTED

WHEREFORE, at the hearing on this Motion, the Debtors will request entry of the Interim Order, substantially in the form attached hereto as **Exhibit A**:

(a) authorizing the Debtors to use Cash Collateral on an interim basis in accordance with the terms and conditions of the Interim Order and Budget;

(b) scheduling a final hearing within 14 days of the Petition Date or such other date as the Court deems appropriate under the rules to consider entry of a final order authorizing the Debtors to use Cash Collateral; and

(c) granting such further relief as the Court deems appropriate.

Dated: February 4, 2014.

BROWNSTEIN HYATT FARBER
SCHRECK, LLP
    Michael J. Pankow
    Joshua M. Hantman

        -AND-

MESCH, CLARK & ROTHSCHILD, P.C.


By: s/Kasey C. Nye, #20610
    Michael McGrath
    Kasey C. Nye
    *Proposed Attorneys for Debtors*

20P7923

# EXHIBIT A

1
2
3
4
5
6
7

**UNITED STATES BANKRUPTCY COURT**

8

**FOR THE DISTRICT OF ARIZONA**

9

| | |
|---|---|
| In re:<br>REGIONAL CARE SERVICES CORP.,<br>  Debtor. | Chapter 11 Proceedings<br><br>No. 4:14-bk-01383-EWH |
| In re:<br>CASA GRANDE COMMUNITY<br>HOSPITAL D/B/A CASA GRANDE<br>REGIONAL MEDICAL CENTER,<br>  Debtor. | No. 4:14-bk-01384-BMW |
| In re:<br>REGIONAL CARE PHYSICIAN'S<br>GROUP, INC.,<br>  Debtor. | No. 4:14-bk-01385-EWH |
| In re:<br>CASA GRANDE REGIONAL<br>RETIREMENT COMMUNITY,<br>  Debtor. | No. 4:14-bk-01386-EWH |

10
11
12
13
14
15
16
17
18
19
20

**STIPULATED INTERIM ORDER (1) AUTHORIZING INTERIM USE OF CASH COLLATERAL, (2) GRANTING ADEQUATE PROTECTION TO TRUSTEE AND (3) SCHEDULING A FINAL HEARING**

21
22

Upon the motion (the "**Motion**")[1] of Casa Grande Community Hospital, Inc. ("**Casa**

23

**Grande**") and its jointly administered debtor affiliates, the debtors and debtors-in-

24

possession in the above-captioned case (the "**Debtors**"), for an interim order (this "**Order**")

25
26

---

[1]   All capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

(1) authorizing the Debtors to use the cash collateral of the Trustee, (2) granting the Trustee adequate protection upon the terms set forth in interim and final orders, and (3) scheduling a final hearing on the Motion and approving the form and manner of notice thereof; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of this case and the Motion in this district is proper pursuant to 28 U.S.C. § 1408; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor;

IT IS HEREBY FOUND THAT[2]:

A.     On the Petition Date, each of the Debtors filed a petition for relief under Chapter 11 of the Bankruptcy Code.

B.     The Debtors continue in the management and operation of their businesses and properties as a debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or committee has been appointed in the Debtors' Chapter 11 cases.

C.     The Debtors stipulate and agree that Casa Grande is obligated under the following undertakings (collectively, the "**Bond Financing Documents**"):

(1)     a certain Master Indenture of Trust dated July 1, 2001 (as supplemented and amended, the "**Master Indenture**"), by and between Casa Grande and Wells Fargo Bank, National Association,[3] not individually, but as master trustee (the "**Master Trustee**");

---

[2] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

(2)     certain "Obligations" (as defined in the Master Indenture), in the form of promissory notes, made by Casa Grande pursuant to the Master Indenture;

(3)     a certain Bond Indenture, dated July 1, 2001 (as supplemented and amended, the "**Bond Indenture**"), by and between the Industrial Development Authority of the City of Casa Grande (the "**Authority**") and Wells Fargo Bank, National Association, not individually, but as bond trustee (the "**Bond Trustee**" and, together with the Master Trustee, the "**Trustee**");

(4)     a certain Deed of Trust and Assignment of Rents with Security Agreement dated August 1, 2001 (as supplemented and amended, the "**Deed of Trust**"), pursuant to which Casa Grande granted a lien on its interest in the "Casa Grande Hospital Site," all "Buildings and Improvements" thereon, all "Collateral," and all "Fixtures," and a security interest in the Casa Grande Hospital Revenues (each as defined in the Deed of Trust);

(5)     those certain Hospital Revenue Refunding Bonds (Casa Grande Regional Medical Center), Series 2001A (the "**2001A Bonds**"), issued pursuant to the Bond Indenture in the initial aggregate principal amount of $41,845,000;

(6)     those certain Hospital Revenue Refunding Bonds (Casa Grande Regional Medical Center), Series 2001B (the "**2001B Bonds**") issued pursuant to the Bond Indenture in the initial aggregate principal amount of $4,645,000;

(7)     those certain Hospital Revenue Bonds (Casa Grande Regional Medical Center) Series 2002A (the "**2002A Bonds***"* and, together with the 2001A Bonds and the 2001B Bonds, the *"***Bonds"**) issued pursuant to the Bond Indenture in the initial aggregate principal amount of $25,475,000; and

(8)     a certain Loan Agreement dated July 1, 2001 (as supplemented and amended, the "**Loan Agreement**"), by and between the Authority and Casa Grande, pursuant to which Casa Grande covenanted to make payments at such times and in such amounts so as to provide for the payment of the principal of, premium, if any, and interest on the Bonds and any fees, costs and expenses related thereto (collectively, the "**Prepetition Obligations**").

The foregoing acknowledgments and stipulations shall be binding on the Debtors but not on any other party-in-interest in this Case, except as provided in Paragraph 8 hereof.

D.     The Debtors further stipulate and agree as follows:

---

[3] Wells Fargo Bank Arizona, National Association was the original master trustee under the Master Indenture. Wells Fargo Bank Arizona, National Association thereafter changed its name to Wells Fargo Bank, National Association.

(1)     As of the Petition Date, the Bond Financing Documents are each valid and enforceable against Casa Grande, and the Debtors do not possess and agree not to assert any claim (as such term is defined in section 101(5) of the Bankruptcy Code), counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity or  enforceability of the Bond Financing Documents;

(2)     As of the Petition Date, the Prepetition Obligations constitute legal, valid and binding obligations of Casa Grande, enforceable in accordance with the terms of the Bond Financing Documents (other than with respect to a stay of enforcement arising from section 362 of the Bankruptcy Code); no offsets, defenses or counterclaims to any of the Prepetition Obligations exists; no portion of the Prepetition Obligations is subject to recharacterization, disallowance, reduction or subordination pursuant to the Bankruptcy Code or non-bankruptcy law; the Prepetition Obligations constitute allowable secured claims; and the Debtors have irrevocably waived, discharged and released any rights they may have to challenge or object to the Prepetition Obligations;

(3)     The Trustee's liens and security interests with respect to the Casa Grande Hospital Site, all Buildings and Improvements thereon, all Collateral, all Fixtures, and the Casa Grande Hospital Revenues (each as defined in the Bond Financing Documents) are valid, enforceable and perfected (subject to operation of federal anti-assignment provisions, to the extent applicable, and including cash to the extent that it constitutes proceeds of collateral which is subject to the Trustee's perfected liens and security interests), and such liens and security interests are not subject to recharacterization, disallowance, reduction or subordination pursuant to the Bankruptcy Code or non-bankruptcy law.  (The Debtors' assets subject to such liens and security interests, to the extent valid, enforceable, perfected and unavoidable shall be referred herein to as the "Prepetition Collateral.")  All of such financing statements and the Deed of Trust were validly authorized by Casa Grande or validly executed by authorized representatives of Casa Grande.  Pursuant to the Bond Financing Documents, the Trustee has security interests in and liens on all of the Prepetition Collateral, including the Cash Collateral (defined herein) and all proceeds of the Prepetition Collateral, to secure payment of the Prepetition Obligations;

(4)     Pursuant to the Bond Financing Documents, certain accounts were established and are held in trust by the Trustee (collectively, the "**Trustee-Held Funds**"), including, without limitation, (i) a certain "Revenue Fund", (ii) a certain "Interest Account", (iii) a certain "Principal Account", and (iv) a certain "Bond Reserve Account" (each as defined in the Bond Indenture).   The Trustee-Held Funds are held in trust for the benefit of the holders of the Bonds as set forth the Bond Financing Documents and for the express purposes set forth therein.  The Trustee believes that the Trustee-Held Funds are not property of the Debtors' estates.  The Debtor acknowledges that the Trustee holds a validly perfected possessory security interest in the Trustee-Held Funds, and is entitled to access the

Trustee-Held Funds in accordance with the Bond Financing Documents. To the extent that the automatic stay otherwise applies to such Trustee-Held Funds pursuant to Bankruptcy Code Section 362(a), as adequate protection for the use of the Trustee's Cash Collateral, the Debtors stipulate to relief from such stay for the limited purpose of allowing the Trustee to administer and apply the Trustee-Held Funds in accordance with the Bond Financing Documents. The Trustee-Held Funds shall not be used or made available to the Debtors as Cash Collateral or otherwise pursuant to this Interim Order, the Final Order or any other order entered in this case;

(5) The Trustee's security interests and liens have attached to all funds and property of Casa Grande consisting of the Prepetition Collateral and the products and proceeds thereof, and the Trustee's security interests and liens will, notwithstanding the commencement of the Chapter 11 Case, as of the Petition Date and thereafter, attach to the products and proceeds of the Prepetition Collateral. Without limiting the foregoing, the Trustee's security interests and liens attach to all cash (whether as original collateral or cash proceeds of the Prepetition Collateral), negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents now or hereafter in the possession, custody or control of Casa Grande (as defined in section 363(a) of the Bankruptcy Code, the "**Cash Collateral**"). For the avoidance of doubt, the term "Cash Collateral" does not include Trustee-Held Funds for purposes of this Order.

The foregoing acknowledgments and stipulations shall be binding on the Debtors but not on any other party-in-interest in this Case, except as provided in Paragraph 8 hereof.

E. The Debtors have requested that the Trustee consent to the Debtors' use of Cash Collateral and the Trustee is willing to consent to the Debtors' use of Cash Collateral on the terms and conditions provided herein. The Trustee is relying on the terms, conditions and protections provided herein in so consenting.

F. The agreements and arrangements described in the Motion and authorized in this Order have been negotiated at arm's-length with all parties represented by counsel, are fair and reasonable under the circumstances, and are enforceable in accordance with their terms. The Debtors and the Trustee are acting in good faith with respect to the use of Cash Collateral as provided in this Order. The superpriority claims, security interests and liens and other protections granted to the Trustee pursuant to this Order will not be affected by

any subsequent reversal, modification, vacatur or amendment of this Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

G.     In light of the Trustee's agreement to subordinate its liens and superpriority claims to the Carve-Out (defined herein), and its agreement to permit use of its Cash Collateral, the Trustee is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall not apply.

H.     The liens and security interests granted to the Trustee hereunder shall not prime or impair any validly perfected lien or security interest senior to the liens and security interests of the Trustee with respect to Casa Grande's assets and properties as of the Petition Date (the "**Prior Senior Liens**").  The granting of the replacement liens, super-priority administrative claims and other agreements of the Debtors hereunder constitute adequate protection to the Trustee for the Debtors' use of Cash Collateral for purposes of this Order.

I.     Good cause has been shown for entry of this Order.  Without use of Cash Collateral, the Debtors will not be able to fund their day-to-day operations, including payroll for their employees.  Unless the Court authorizes the use of Cash Collateral, the Debtors will be unable to pay for the goods and services necessary to preserve and maximize the value of their assets while they attempt to obtain confirmation of their Chapter 11 plans providing for, among other things, the sale ("**Sale**") of substantially all of their assets (the "**Assets**").  Accordingly, this Order is required to avoid immediate and irreparable harm to the Debtors' estates.  Entry of this Order is in the best interests of the Debtors, their creditors, and the estate.

THE COURT HEREBY ORDERS, AS FOLLOWS:

1.     The Motion is granted on an interim basis in accordance with the terms and conditions of this Order.

2.    Use of Cash Collateral.  Subject to the terms and conditions set forth in this Order, the Debtors are, through and including the earlier of (a) the conclusion of the final hearing on the Debtors' use of Cash Collateral or (b) termination of this Order following issuance of a Termination Notice as set forth in Paragraph 10 below, authorized pursuant to Bankruptcy Code sections 105, 361, 362 and 363, and Bankruptcy Rules 2002, 4001, 6003 and 9014 to use Cash Collateral on an interim basis pending a final determination by the Court.  The Cash Collateral may only be used to fund the types and corresponding amounts of itemized expenditures contained in the budget attached hereto as Exhibit A (the "*Budget*"); provided, however, that the Debtors may use Cash Collateral in excess of the line-item amounts designated for (x) payroll and employee-related expenses and (y) all other non-employee-related expenses so long as the percentage of deviation of each such line item category during any rolling 4-week period does not exceed twenty percent (20%) per line-item and, in addition, overall cash receipts and disbursements under the Budget do not exceed ten percent (10%) in aggregate (the "*Variance*"); and provided further that any amendment or modification of the terms and conditions, or any amendment, modification, roll-forward or replacement of the Budget itself, shall be subject to the prior written consent of the Trustee.  Any unused portion of the Variance will carry over to the following rolling 4-week period.

3.    Reporting.  No later than Friday of each week (or if such day is not a Business Day, the next succeeding Business Day), the Debtors will submit to the Trustee or its advisors (a) a cash flow report setting forth the Debtors' actual performance for the immediately preceding week and a comparison of the actual performance for such week against the forecast for such week in the Budget, in each case with written explanations of material variances, and (b) a flash report of key performance metrics for the immediately preceding week (i.e., average daily census, emergency room visits, urgent care visits, observations, births,  and, every two weeks, total paid FTEs and total productive FTEs).

The Debtors will further submit monthly discharges, consolidated balance sheets, related consolidated statements of income or operations, and cash flows, cash balance reports or any other financial reports as reasonably requested by the Trustee.  The Debtors will make their books and records, and their financial staff and advisors, reasonably available to the Trustee and its advisors at any time between the hours of 9:00 a.m. and 5:00 p.m. (CST) on any weekday, with not less than forty-eight (48) hours advance notice, to enable the Trustee to monitor the Debtors' compliance with the Budget and this Interim Order and the Debtors' operations (whether historic, current, or prospective).

4.    <u>Adequate Protection; Replacement Liens</u>.  The Trustee is entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of its interests in the Prepetition Collateral, including, but not limited to, the Cash Collateral, for any diminution in value of its interests in the Prepetition Collateral, including, without limitation, any such diminution resulting from the Debtors' use of Cash Collateral and any other Prepetition Collateral and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.  As security for and solely to the extent of any diminution in the value of the Trustee's Prepetition Collateral from and after the Petition Date, calculated in accordance with section 506(a) of the Bankruptcy Code (a "**Diminution in Value**"), the Trustee is hereby granted senior priority replacement liens, upon all assets and property of the Debtors and their respective estates of any kind or nature whatsoever, now existing or hereafter acquired, including, without limitation, the Prepetition Collateral (the "**Replacement Liens**"), but excluding all claims and causes of action, and the products and proceeds thereof, arising under or permitted by sections 502(d), 506(c), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code and any other avoidance claims and causes of action arising under state or federal law; <u>provided</u>, <u>however</u>, that the Replacement Liens shall be subject and subordinate to (a) the Carve-Out (defined below), (b) the Prior Senior Liens, and (c) any administrative claim granted to Banner Health ("**DIP Lender**") in connection with

an approved debtor-in-possession financing facility (the "**DIP Financing**," and the documents governing the DIP Financing, the "**DIP Financing Documents**").  The Replacement Liens so granted are in addition to all security interests, liens, and rights of setoff existing in favor of the Trustee on the Petition Date, and are and shall be valid, perfected, enforceable and effective as of the Petition Date, without any further action of the Debtors or the Trustee and without the necessity of the execution, filing or recording of any financing statements, security agreements, mortgages, or other documents, or of obtaining control agreements over bank accounts.  Notwithstanding the foregoing, the Trustee is hereby authorized, but not required, to file or record any financing statements, security agreements, mortgages, or other documents in any jurisdiction or take any other action in order to validate and perfect the Replacement Liens granted hereunder.

5.     <u>Adequate Protection; 507(b) Priority Claim</u>.  The Trustee is hereby granted an administrative claim with a priority equivalent to a claim under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code, on a dollar-for-dollar basis for and solely to the extent of any Diminution in Value, which administrative claim shall, among other things, have priority over all other costs and expenses of the kind specified in, or ordered pursuant to, sections 105, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 1113 and 1114 of the Bankruptcy Code (the "**Super-Priority Administrative Claim**"), except for expenditures constituting the Carve-Out and the superpriority administrative claim granted to the Banner in connection with the DIP Financing.

6.     <u>Adequate Protection; Fees and Expenses</u>.  The reasonable fees and expenses of the Trustee's outside legal and financial advisors, and the Trustee's internal fees and expenses, are hereby authorized to be paid pursuant to the Budget and otherwise through deductions made by the Trustee and its professionals from (a) any expense retainers funded by the Debtors prior to the Petition Date and/or (b) the Trustee-Held Funds in accordance with the Bond Financing Documents.  Notwithstanding the foregoing, the Trustee reserves

its right to assert claims for the payment of additional amounts provided for in the Bond

Financing Documents, and to seek additional or further adequate protection from the Court.

7.    Carve-Out.  The Replacement Liens and Super-Priority Administrative Claim

granted hereunder shall be junior and subordinate to the following fees and expenses (the

"*Carve-Out*"):  (a) all budgeted and accrued but unpaid fees and expenses (the

"**Professional Fees and Expenses**") of the attorneys, accountants or other professionals

retained by the Debtors and any statutory committee of unsecured creditors appointed in the

Chapter 11 case under section 327 or 1103(a) of the Bankruptcy Code (the "**Committee**")

(collectively, the "**Professionals**"), allocable to the Debtors under and to the extent set forth

in the Budget and incurred prior to the delivery of a Termination Notice; (b) Professional

Fees and Expenses in the amount of $50,000.00 incurred after delivery of a Termination

Notice; and (c) the payment of fees pursuant to 28 U.S.C. § 1930 to the extent related to the

Debtors' Chapter 11 cases, provided that all such fees and expenses shall be subject to

approval by a final order of the Court pursuant to sections 326, 328, 330, 331 or 363 of the

Bankruptcy Code.  Notwithstanding anything to the contrary set forth herein, no Cash

Collateral nor any portion of the Carve-Out may be used to prosecute actions, claims,

demands or causes of action against the Trustee, or to object to or contest in any manner, or

to raise any defense in any pleading to the validity, perfection, priority or enforceability of

the Trustee's liens and security interests against the Prepetition Collateral or the

Replacement Liens.

8.    Parties in Interest Bound.

(a)    The admissions and stipulations contained in Paragraphs C and D of
this Order shall be binding on the Debtors under all circumstances and shall be binding upon
all other parties in interest, including, without limitation, any Committee and any Chapter 7
or Chapter 11 trustee that may be appointed or elected on behalf of the Debtors' estates,
except to the extent that (i) a party in interest has filed an adversary proceeding or contested
matter challenging the validity, enforceability or priority of the Prepetition Debt, no later
than the date that is twenty-eight (28) days after the date of entry of the Final Order and (ii)
the Court rules in favor of the plaintiff in any such timely filed adversary proceeding or
contested matter.   If any such adversary proceeding or contested matter is timely

commenced as of such date, the admissions contained in this Order shall nonetheless remain binding and preclusive (as provided in this paragraph) except to the extent that such acknowledgments and agreements are expressly challenged in such adversary proceeding or contested matter.

(b)     If no such adversary proceeding or contested matter is commenced as of such date, then (i) the Prepetition Obligations shall constitute allowed secured claims, not subject to subordination (other than as set forth herein with respect to the Carve-Out, the Prior Senior Liens, and any administrative claim granted to the DIP Lender in connection with the DIP Financing), for all purposes in these Chapter 11 cases and any subsequent Chapter 7 cases, and (ii) the Prepetition Obligations shall not be subject to any other or further challenge by any party-in-interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto.

9.     Events of Default.  Each of the following shall constitute an event of default ("**Event of Default**") with respect to the Debtors' authorization to use Cash Collateral hereunder, unless otherwise waived in writing by the Trustee:

(a)     entry of an order converting these Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code;

(b)     entry of an order dismissing these Chapter 11 cases;

(c)     entry of an order appointing or directing the election of a trustee or examiner for the Debtors under section 1104 or section 1106(b) of the Bankruptcy Code;

(d)     without the prior written consent of the Trustee, the entry of any order (or other judicial action which has the effect of) amending, reversing, supplementing, staying the effectiveness of, vacating, or otherwise modifying this Order;

(e)     the Debtors use Cash Collateral for any purpose or in a manner other than as permitted in this Order and in the Budget or otherwise fail to comply with any term of this Order;

(f)     entry of an order by the Bankruptcy Court authorizing relief from stay by any person (other than the Trustee) on or with respect to all or any portion of the Prepetition Collateral with a value in excess of $50,000;

(g)     the material breach by the Debtors of their obligations under this Order or the DIP Financing Documents;

(h)     the filing by the Debtors of any debtor-in-possession financing pleadings or any final documents pertaining to a debtor-in-possession financing, other than those filings related to the DIP Financing, not acceptable to and not supported by the Trustee; or

(i)     any of the Debtors voluntarily or involuntarily dissolve or are dissolved, liquidate or are liquidated or cease the operation of any material portion of their businesses.

10. <u>Termination Notice</u>.  Immediately upon the occurrence or existence of an Event of Default, the Trustee shall be authorized to issue a notice (a "**Termination Notice**") thereof to the Debtors, their counsel, counsel to any Committee and the U.S. Trustee, which Termination Notice may be delivered by electronic mail or facsimile.  Unless, within five (5) business days after the issuance of such notice, the Court determines that the applicable Event of Default has not occurred or does not exist, the Debtors' authority to use Cash Collateral shall terminate without prejudice the right of the Debtors to seek court authority to use it or the right of the Trustee to oppose..

11. <u>Trustee-Held Funds</u>. The Trustee may, without further Court authority (including, without limitation, the need to file a motion to lift the automatic stay), access the Trustee-Held Funds in accordance with the terms of the Bond Financing Documents.

12. <u>No Duty to Monitor Compliance</u>.   The Trustee may assume that the Debtors will comply with all terms and conditions of this Order and the Budget and shall not (a) be obligated to ensure or monitor the Debtors' compliance with any financial covenants, formulae or other terms and conditions of this Order or the Bond Financing Documents, (b) be obligated to pay (directly or indirectly from Cash Collateral or otherwise) any expenses incurred or authorized to be incurred pursuant to this Order or in connection with the operation of the Debtors' businesses, or (c) be obligated to ensure or monitor that Cash Collateral exists to pay such expenses.

13. <u>No Waiver</u>.  The failure of the Trustee to seek relief or otherwise exercise its rights and remedies under this Order or the Bond Financing Documents, as applicable, shall not constitute a waiver of any of the Trustee's rights hereunder, thereunder or otherwise.

14. <u>No Third Party Rights</u>. Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holders or any direct, indirect or incidental beneficiary.

15.     Section 552(b).   In light of its agreement to subordinate its liens and superpriority claims to the Carve-Out, the Trustee shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Trustee with respect to products and proceeds of any of the Prepetition Collateral.

16.     Effect of Order.   This Order shall be effective upon its entry and not subject to any stay (notwithstanding anything to the contrary contained in the Bankruptcy Rules, including Bankruptcy Rule 4001(a)(3)).   The provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order which may be entered (a) confirming any plan of reorganization; (b) dismissing these Chapter 11 cases; (c) converting these Chapter 11 cases to any other Chapter under the Bankruptcy Code; (d) withdrawing of the references of these Chapter 11 cases from the Court; and (e) providing for abstention from handling or retaining of jurisdiction of these Chapter 11 cases in the Court.

17.     Amendments and Waivers.   The Debtors and the Trustee may amend, modify, supplement or waive any provision of this Order in writing if such amendment, modification, supplement or waiver is not material, without any need to apply to, or receive further approval from, the Court.   The Debtors shall provide notice of any such nonmaterial amendment, modification, supplement or waiver to counsel for any Committee and the Office of the United States Trustee.   Any material amendment, modification, supplement or waiver shall be in writing, signed by the Debtors and the Trustee, and approved by the Court on appropriate notice by the Debtors.

18.     Trustee Not in Control of Debtors' Operations.   With respect to the Debtors' use of Cash Collateral pursuant to this Interim Order and any subsequent order, or any actions reasonably related to this Interim Order, the motion or the Bond Financing Documents, neither the Trustee nor its agents, employees, attorneys or representatives shall have any liability to any third party (including creditors of the Debtors) and shall not be

deemed to be in control of the Debtors' operations or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors.

19. <u>Order Governs</u>. In the event of any inconsistency between the provisions of this Order and the Motion, the provisions of this Order shall govern.

20. <u>Final Hearing</u>. A final hearing on the Motion will be scheduled for February ___, 2014, at ___ a.m./p.m. (MST/MDT) (the "**Final Hearing**"). The Debtors will provide notice of the Final Hearing by first class mail upon (a) counsel for the Trustee, (b) counsel for any Committee, (c) the Office of the United States Trustee, (d) all parties who have filed requests for notice under Bankruptcy Rule 2002, (e) the holders of the twenty (20) largest unsecured claims against the Debtors, and (f) such other parties as this Court may order. Any party wishing to object to the relief granted herein being granted on a permanent basis shall file such objection with the Court, together with proof of service thereof, and served upon: (a) counsel for the Debtors; (b) counsel for the Trustee; (c) counsel for any Committee; and (d) the Office of the United States Trustee, so as to be received no later than February ___, 2014, at ___ p.m. (MST/MDT) (the "**Objection Deadline**"). If no objections are filed and served on or before the Objection Deadline, at the Final Hearing, the Court may enter a final order permitting the use of cash collateral by the Debtors.

## DATED AND SIGNED ABOVE.

Agreed to by:

Casa Grande Community Hospital, Inc., *et al*. as debtors
and debtors-in-possession through their counsel

s/Kasey C. Nye, #20610

Wells Fargo Bank, National Association, as trustee
through its counsel

*/s/ Nathan F. Coco*

# EXHIBIT A

**Casa Grande Regional Medical Center**
Cash Flow Forecast
($s)

| | Actual | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week: | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| Week Ending: | 2/2/14 | 2/9/14 | 2/16/14 | 2/23/14 | 3/2/14 | 3/9/14 | 3/16/14 | 3/23/14 | 3/30/14 | 4/6/14 | 4/13/14 | 4/20/14 |
| *Cash Receipts* | | | | | | | | | | | | |
| Net Patient Receipts net of RAC | 1,876,098 | 1,902,125 | 1,923,413 | 1,949,716 | 2,022,259 | 2,134,159 | 2,197,763 | 2,241,255 | 2,128,434 | 1,986,102 | 1,974,046 | |
| Non Patient Receipts | | | | | | | | | | | | |
| Cerner | - | - | - | - | - | - | 1,100,000 | - | - | - | - | - |
| Rental Income | 22,844 | - | - | 22,844 | 22,844 | - | - | - | - | 22,844 | 22,844 | - |
| Cafeteria | 5,725 | 5,725 | 5,725 | 5,725 | 5,919 | 5,919 | 5,919 | 5,919 | 5,919 | 6,459 | 6,459 | 6,459 |
| Express Scripts Rebate | - | - | - | - | - | - | - | 20,000 | - | - | - | - |
| Other Non Patient Receipts | 5,420 | 5,420 | 5,420 | 5,420 | 5,420 | 5,420 | 5,420 | 5,420 | 5,420 | 5,420 | 5,420 | 5,420 |
| Total Non Patient Receipts | 33,989 | 11,145 | 11,145 | 33,989 | 34,183 | 11,339 | 1,111,339 | 31,339 | 34,183 | 34,723 | 11,879 | 11,879 |
| *Total Cash Receipts* | 1,910,087 | 1,913,269 | 1,934,558 | 1,983,705 | 2,056,442 | 3,245,497 | 2,229,101 | 2,275,438 | 2,163,157 | 1,997,981 | 1,985,925 | |
| *Cash Disbursements* | | | | | | | | | | | | |
| Payroll | (1,290,218) | - | (1,290,218) | - | (1,251,222) | - | (1,251,222) | - | (1,191,780) | - | (1,191,780) | |
| Physician Staffing | (434,494) | (54,208) | - | (75,208) | (166,420) | (288,162) | (19,700) | - | (78,208) | (262,354) | (194,308) | |
| Non-Physician Staffing | (148,573) | (72,500) | (79,696) | (143,500) | (21,760) | (193,500) | (72,938) | (133,500) | (21,760) | (183,500) | (54,518) | |
| Medical Benefits | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) | |
| Payroll Taxes & Benefits | (79,682) | (669,343) | (40,481) | (736,343) | (89,481) | (619,257) | (40,481) | (614,257) | (109,481) | (651,630) | (19,481) | |
| *Total Payroll Related Disbursements* | (2,087,966) | (931,051) | (1,545,395) | (1,090,051) | (1,663,884) | (1,235,920) | (1,519,341) | (882,757) | (1,536,229) | (1,232,484) | (1,595,087) | |
| Trade Payments | (157,791) | (791,864) | (438,845) | (962,164) | (464,497) | (928,896) | (464,497) | (1,039,759) | (520,053) | (1,029,220) | (568,157) | |
| Medicare Cost Report - 2012 | - | - | - | - | - | (1,115,000) | - | - | - | (90,000) | | |
| Cerner | (22,572) | (21,479) | (22,329) | (22,572) | - | (2,479) | (22,329) | (4,761) | (17,811) | - | (24,808) | |
| Lease and Rental Expense | - | (17,563) | - | (89,871) | - | - | - | - | (89,871) | - | - | |
| Medical Malpractice Insurance | - | (6,229) | (2,770) | (15,094) | (70,102) | (9,029) | - | (2,770) | (74,710) | (4,258) | (4,971) | |
| Utilities | - | (24,126) | (16,878) | (12,800) | - | - | - | - | - | - | - | |
| CapEx | (100) | (24,126) | (400) | - | (11,582) | (12,544) | (400) | - | (11,582) | (12,544) | (400) | |
| Mortgage Payments | - | (562,270) | - | - | - | - | - | - | - | - | - | |
| Tax Assessment | (250) | (1,632) | (1,632) | (1,632) | (1,632) | (1,632) | (1,632) | (1,632) | (1,632) | (1,632) | (1,632) | |
| Other | | | | | | | | | | | | |
| *Operating Disbursements* | (2,268,679) | (2,394,315) | (2,028,249) | (2,211,369) | (2,211,697) | (3,305,499) | (2,008,200) | (1,948,865) | (2,251,889) | (2,370,138) | (2,195,055) | |
| ***Operating Cash Flow*** | (358,593) | (481,045) | (93,691) | (227,664) | (155,255) | (60,002) | 220,902 | 326,573 | (88,732) | (372,157) | (209,130) | |
| Debtors Professional Fees | (25,000) | - | - | (125,000) | - | - | (705,000) | - | (100,000) | - | - | |
| Creditors Committee Fees | - | - | - | - | - | - | (50,000) | - | - | - | - | |
| Bondholders Professional Fees | - | - | - | - | - | - | (175,000) | - | - | - | - | |
| US Trustee Fees | - | - | - | - | - | - | - | - | - | - | (20,000) | |
| Other | - | - | - | - | - | - | (25,000) | - | - | - | - | |
| *Other Cash Receipts / Disbursements* | (25,000) | - | - | (125,000) | - | - | (955,000) | - | (100,000) | - | (20,000) | |
| ***Cash Flow Prior to Add'l Financing*** | (383,593) | (481,045) | (93,691) | (352,664) | (155,255) | (60,002) | (734,098) | 326,573 | (188,732) | (372,157) | (229,130) | |
| Beginning Balance | 5,191,777 | 4,808,184 | 4,993,691 | 4,900,000 | 5,055,255 | 4,900,000 | 5,634,098 | 4,900,000 | 5,226,573 | 5,037,842 | 5,129,130 | |
| Pre-financing Cash Flow | (383,593) | (481,045) | (93,691) | (352,664) | (155,255) | (60,002) | (734,098) | 326,573 | (188,732) | (372,157) | (229,130) | |
| DIP / Revolver | - | 666,552 | - | 507,919 | - | 794,100 | - | - | - | 463,445 | - | |
| Fee / Interest on DIP / Revolver | - | - | - | - | - | - | - | - | - | - | - | |
| *Ending Cash Balance* | 5,191,777 | 4,808,184 | 4,993,691 | 4,900,000 | 5,055,255 | 4,900,000 | 5,634,098 | 4,900,000 | 5,226,573 | 5,037,842 | 5,129,130 | 4,900,000 |
| **DIP / Revolver Summary** | | | | | | | | | | | | |
| Starting Balance | | 3,308,000 | 3,308,000 | 3,974,552 | 3,974,552 | 4,482,471 | 4,482,471 | 5,276,571 | 5,276,571 | 5,276,571 | 5,276,571 | 5,740,016 |
| Drawdown / (Payback) | | - | 666,552 | - | 507,919 | - | 794,100 | - | - | - | 463,445 | - |
| *Ending Balance* | 3,308,000 | 3,308,000 | 3,974,552 | 3,974,552 | 4,482,471 | 4,482,471 | 5,276,571 | 5,276,571 | 5,276,571 | 5,276,571 | 5,740,016 | 5,740,016 |
| Max DIP / Revolver | | | | | | | | | | | | |

**Casa Grande Regional Medical Center**
Cash Flow Forecast
($s)

| | Forecast 12 | Forecast 13 | Forecast 14 | Forecast 15 | Forecast 16 | Forecast 17 | Forecast 18 | Forecast 19 | Forecast 20 | Forecast 21 | Total Wks 1 - 21 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending: | 4/27/14 | 5/4/14 | 5/11/14 | 5/18/14 | 5/25/14 | 6/1/14 | 6/8/14 | 6/15/14 | 6/22/14 | 6/29/14 | |
| *Cash Receipts* | | | | | | | | | | | |
| Net Patient Receipts net of RAC | 1,928,538 | 1,919,356 | 1,909,597 | 1,885,541 | 1,883,392 | 1,866,267 | 1,860,253 | 1,827,945 | 1,809,282 | 1,787,810 | 41,013,352 |
| Non Patient Receipts | | | | | | | | | | | |
| Cerner | - | - | - | 1,100,000 | - | - | - | - | - | - | 2,200,000 |
| Rental Income | 22,844 | 22,844 | - | - | - | 22,844 | 22,844 | - | - | 22,844 | 228,440 |
| Cafeteria | 6,459 | 5,760 | 5,760 | 5,760 | 5,760 | 5,760 | 6,078 | 6,078 | 6,078 | 6,078 | 125,526 |
| Express Scripts Rebate | - | - | - | - | - | - | - | - | - | 20,000 | 40,000 |
| Other Non Patient Receipts | 5,420 | 5,420 | 5,420 | 5,420 | 5,420 | 5,420 | 5,420 | 5,420 | 5,420 | 5,420 | 113,819 |
| Total Non Patient Receipts | 34,723 | 34,024 | 11,180 | 1,111,180 | 11,180 | 34,024 | 34,342 | 11,498 | 11,498 | 54,342 | 2,707,784 |
| *Total Cash Receipts* | 1,963,262 | 1,953,380 | 1,920,777 | 2,996,721 | 1,894,572 | 1,900,291 | 1,894,596 | 1,839,444 | 1,820,780 | 1,842,152 | 43,721,136 |
| *Cash Disbursements* | | | | | | | | | | | |
| Payroll | - | (1,159,641) | - | (1,159,641) | - | (1,153,244) | - | (1,153,244) | - | (1,153,244) | (13,245,454) |
| Physician Staffing | (4,700) | (76,208) | (255,721) | (168,392) | (4,700) | (76,208) | (99,621) | (306,540) | (10,700) | (51,208) | (2,627,061) |
| Non-Physician Staffing | (136,496) | (21,760) | (183,500) | (54,518) | (136,496) | (21,760) | (183,500) | (54,518) | (136,496) | (21,760) | (2,076,547) |
| Medical Benefits | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) | (2,835,000) |
| Payroll Taxes & Benefits | (604,630) | (107,481) | (587,564) | (81,481) | (591,453) | (107,481) | (575,830) | (19,481) | (629,830) | (40,481) | (7,015,629) |
| Total Payroll Related Disbursements | (880,825) | (1,500,090) | (1,161,785) | (1,599,032) | (867,649) | (1,493,693) | (993,951) | (1,668,783) | (912,026) | (1,401,693) | (27,799,692) |
| Trade Payments | (950,337) | (432,737) | (876,567) | (359,543) | (841,096) | (304,054) | (837,073) | (304,054) | (848,424) | (304,054) | (13,423,685) |
| Medicare Cost Report - 2012 | - | - | - | - | - | - | - | - | - | - | (90,000) |
| Cerner | - | - | - | (1,115,000) | - | - | - | - | - | - | (2,230,000) |
| Lease and Rental Expense | - | (22,572) | - | (24,808) | - | (22,572) | - | (24,808) | - | (22,572) | (278,470) |
| Medical Malpractice Insurance | (7,297) | (89,871) | - | (12,994) | - | - | (89,871) | - | - | - | (397,338) |
| Utilities | (3,723) | - | (63,075) | (11,028) | (2,770) | - | (953) | (90,177) | (11,526) | (3,723) | (376,910) |
| CapEx | - | - | - | - | - | - | - | - | - | (93,300) | (161,078) |
| Mortgage Payments | - | (11,582) | (12,544) | (400) | - | (11,582) | (12,544) | (5,500) | - | (11,582) | (139,414) |
| Tax Assessment | - | - | - | (562,270) | - | - | - | - | - | - | (1,124,541) |
| Other | (1,632) | (18,817) | (1,632) | (1,632) | (1,632) | (18,817) | (1,632) | (1,632) | (1,632) | (1,632) | (101,631) |
| *Operating Disbursements* | (1,843,815) | (2,075,670) | (2,115,603) | (3,686,707) | (1,713,147) | (1,850,719) | (1,936,024) | (2,094,953) | (1,773,608) | (1,838,557) | (46,122,758) |
| **Operating Cash Flow** | 119,447 | (122,290) | (194,826) | (689,987) | 181,425 | 49,572 | (41,428) | (255,509) | 47,172 | 3,595 | (2,401,622) |
| Debtors Professional Fees | (710,000) | (75,000) | - | - | (685,000) | - | (50,000) | - | (485,000) | (240,000) | (3,200,000) |
| Creditors Committee Fees | (35,000) | - | - | - | (25,000) | - | - | - | (15,000) | (25,000) | (150,000) |
| Bondholders Professional Fees | (150,000) | - | - | - | (150,000) | - | - | - | (125,000) | - | (600,000) |
| US Trustee Fees | - | - | - | - | - | - | - | - | - | (20,000) | (40,000) |
| Other | (25,000) | - | - | - | (25,000) | - | - | - | - | (25,000) | (100,000) |
| Other Cash Receipts / Disbursements | (920,000) | (75,000) | - | - | (885,000) | - | (50,000) | - | (625,000) | (310,000) | (4,090,000) |
| **Cash Flow Prior to Add'l Financing** | (800,553) | (197,290) | (194,826) | (689,987) | (703,575) | 49,572 | (91,428) | (255,509) | (577,828) | (306,405) | (6,491,622) |
| Beginning Balance | 4,900,000 | 5,097,290 | 4,900,000 | 5,589,987 | 4,900,000 | 4,900,000 | 4,949,572 | 5,155,509 | 4,900,000 | 5,206,405 | 5,191,777 |
| Pre-financing Cash Flow | (800,553) | (197,290) | (194,826) | (689,987) | (703,575) | 49,572 | (91,428) | (255,509) | (577,828) | (306,405) | (6,491,622) |
| DIP / Revolver | 997,843 | - | 884,813 | - | 703,575 | - | 297,366 | - | 884,233 | - | 6,199,845 |
| Fee / Interest on DIP / Revolver | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Cash Balance** | 5,097,290 | 4,900,000 | 5,589,987 | 4,900,000 | 4,900,000 | 4,949,572 | 5,155,509 | 4,900,000 | 5,206,405 | 4,900,000 | 4,900,000 |
| **DIP / Revolver Summary** | | | | | | | | | | | |
| Starting Balance | 5,740,016 | 6,737,858 | 6,737,858 | 7,622,671 | 7,622,671 | 8,326,246 | 8,326,246 | 8,623,612 | 8,623,612 | 9,507,845 | 3,308,000 |
| Drawdown / (Payback) | 997,843 | - | 884,813 | - | 703,575 | - | 297,366 | - | 884,233 | - | 6,199,845 |
| **Ending Balance** | 6,737,858 | 6,737,858 | 7,622,671 | 7,622,671 | 8,326,246 | 8,326,246 | 8,623,612 | 8,623,612 | 9,507,845 | 9,507,845 | 9,507,845 |
| Max DIP / Revolver | | | | | | | | | | | 9,507,845 |

Subject to Confidentiality and Non-Disclosure Agreement
Draft Subject to Revision

2