MESCH, CLARK & ROTHSCHILD, P.C.
259 North Meyer Avenue
Tucson, Arizona 85701
Phone: (520) 624-8886
Fax: (520) 798-1037
Email: mmcgrath@mcrazlaw.com
      knye@mcrazlaw.com
By:    Michael McGrath, #6019
       Kasey C. Nye, #20610

BROWNSTEIN HYATT FARBER
SCHRECK, LLP
410 Seventeenth Street, Suite 2200
Denver, CO 80202-4432
Phone: (303) 223-1100
Fax: (303) 223-1111
Email: mpankow@bhfs.com
      jhantman@bhfs.com
By: Michael J. Pankow (Pro Hac Vice)
     Joshua M. Hantman (Pro Hac Vice)

Attorneys for Debtors

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>REGIONAL CARE SERVICES CORP.,<br><br>CASA GRANDE COMMUNITY HOSPITAL<br>REGIONAL CARE PHYSICIAN'S GROUP, INC., and<br>CASA GRANDE REGIONAL RETIREMENT<br><br>Debtors. | Chapter 11 Proceedings<br><br>Case Nos. 4:14-bk-01383-EWH<br>4:14-bk-01384-EWH<br>4:14-bk-01385-EWH<br>4:14-bk-01386-EWH<br>(Joint Administration) |
| This Filing Applies to:<br><br>☒ All Debtors<br>☐ Specified Debtor(s) | Hearing Date: March 17, 2014<br>Hearing Time: 1:30 p.m.<br>Location: , Courtroom #329, U.S. Bankruptcy Court, 38 S. Scott Avenue, Tucson, AZ |

## DISCLOSURE STATEMENT FOR
## DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION

### Dated: March 28, 2014

014855\0013\10999220.21

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ......................................................................................................1
     A.   Overview............................................................................................................1
     B.   Disclaimers and Limitations ............................................................................3
     C.   Definitions ........................................................................................................4
     D.   Classification and Treatment of Claims ..........................................................4
     E.   Parties Entitled to Vote on the Plan ................................................................6
     F.   Voting Procedures, Confirmation Hearing, and Cramdown.............................7
     G.   Effect of Confirmation of the Plan ..................................................................8
     H.   Approval of the Disclosure Statement .............................................................8

II.  HISTORY AND ORGANIZATION OF THE DEBTORS........................................8
     A.   CGRMC.............................................................................................................8
     B.   Background on Other Debtor Entities ............................................................10
     C.   Description of the Non-Debtor Affiliates ......................................................11
     D.   Outstanding Debts ..........................................................................................11
     E.   Major Assets ...................................................................................................15
     F.   Other Litigation ..............................................................................................17
     G.   Events Leading to Chapter 11 Filing .............................................................17

III. DESCRIPTION OF PLAN TERMS .......................................................................23
     A.   Description of the Plan and Means of Implementation ..................................23
     B.   Plan Summary..................................................................................................23
     C.   Banner Transaction .........................................................................................23
     D.   Treatment of Claims .......................................................................................28
     E.   Executory Contracts and Unexpired Leases ..................................................34
     F.   Anticipated Litigation; Waiver of Avoidance Claims....................................36
     G.   Feasibility and Distributions to Creditors .....................................................36
     H.   Federal Income Tax Consequences to Creditors ............................................37

IV.  THE CREDITOR TRUST .......................................................................................38
     A.   Creditor Trust Agreement...............................................................................38
     B.   Appointment of Creditor Trustee....................................................................39
     C.   Powers and Duties of the Disbursing Agent...................................................39
     D.   Corporate Authority........................................................................................40
     E.   Compensation of Creditor Trustee and Professionals Retained by Him ........40
     F.   Post-Effective Date Statutory Fees.................................................................40
     G.   Post Confirmation Reports .............................................................................41
     H.   Exculpation .....................................................................................................41

V.   PROCEDURES FOR RESOLVING AND TREATING CONTESTED
     CLAIMS ..................................................................................................................41

A.   Term of the Automatic Stay ...........................................................41
B.   Objections to Claims and Settlements ...........................................41
C.   Reserves for Disputed Claims .......................................................42
D.   Other Provisions ...........................................................................42

VI.   MISCELLANEOUS PLAN PROVISIONS .................................................42
A.   Waiver of Avoidance Claims.........................................................42
B.   Committee Dissolved.....................................................................42
C.   Discharge .......................................................................................42
D.   Approval of Settlements and Releases ..........................................43
E.   Exculpation ...................................................................................43
F.   Releases .........................................................................................44
G.   Other Provisions ...........................................................................46

VII.   RISK FACTORS ...........................................................................................46

VIII.   ALTERNATIVES AND POTENTIAL PLAN RECOVERY............................48
A.   Chapter 7 Liquidation ...................................................................48
B.   Alternative Plan ............................................................................49
C.   Dismissal of Bankruptcy Case.......................................................49

# I.    INTRODUCTION

## A.    Overview

### 1.    The Purpose of the Disclosure Statement

Regional Care Services Corp. ("RCSC"), Casa Grande Community Hospital d/b/a Casa Grande Regional Medical Center ("CGRMC"), Regional Care Physician's Group, Inc. ("RCPG"), and Casa Grande Regional Retirement Community ("CGRRC") (collectively, the "Debtors") hereby submit this disclosure statement (the "Disclosure Statement") pursuant to 11 U.S.C. § 1125.

The purpose of this Disclosure Statement is to provide Creditors[1] and interested parties in this proceeding with such information as is sufficient to allow Creditors and interested parties to make an informed decision regarding the Debtors' Amended Joint Chapter 11 Plan of Reorganization, attached hereto as Exhibit A (the "Plan"). The Disclosure Statement describes the Plan and explains the Debtors' pre-bankruptcy operations; debt obligations; financial history; and events leading up to the commencement of their chapter 11 cases (the "Chapter 11 Cases" or "Cases").

### 2.    Source of Information

Substantially all of the factual information utilized in this Disclosure Statement, including but not limited to the amount of claims, was obtained from information provided by the Debtors' books and records, the knowledge of their officers, including Rona Curphy as Chief Executive officer and Karen Francis as Chief Financial Officer, and the advisory services of Grant Thornton LLP, the court-appointed Financial Advisor to the Debtors. The financial information, including the value of assets, is based on information provided by the Debtors' officers to their professionals and was prepared for the purposes of this Disclosure Statement. Certain materials contained in this Disclosure Statement are taken directly from other readily accessible documents or are summaries of other documents. While every effort has been made to retain the meaning of

---

[1] See Section (I)(C)(1).

014855\0013\10999220.21

1

1    such documents, creditors and other parties in interest are urged to rely upon the contents of such

2    documents only after a thorough review of the documents themselves.

3                    **3.      Proposed Sale Transaction Under the Plan**

4          The Debtors filed these Cases to effectuate a sale of substantially all of their assets to

5    Banner Health ("Banner") (the "Sale").  Assets will be transferred to Banner in exchange for up

6    to $87 million in cash (subject to adjustments) and forgiveness of loans that Banner has extended

7    or is expected to extend to maintain hospital operations.  Cash proceeds received upon the Sale

8    Closing (the "Sale Proceeds") will pay the Debtors' bond indebtedness, in the aggregate principal

9    amount of $63,785,000 plus accrued interest and fees, in full in exchange for subordination of the

10   $1.3 million prepayment fee to all other claims.  The remainder of the Sale Proceeds will be

11   placed in a trust for the benefit of Creditors (the "Creditor Trust").   Administrative expenses,

12   priority claims, and secured claims will be paid in full from the Creditor Trust.  Remaining funds

13   will be distributed to general unsecured creditors followed by payment of the Allowed Bond

14   Redemption Premium Claim. The Debtors project there will be sufficient funds to pay all

15   creditors in full upon closing of the Sale; any surplus would be returned to Banner.  Following

16   final distributions, the Debtors' estates will be wound down.

17         With the Sale, and by bringing the hospital the Debtors own and operate under the Banner

18   umbrella, the Debtors expect to be able to (1) ensure continued availability of outstanding

19   medical care to the Casa Grande community, (2) preserve jobs for the Debtors' approximately

20   800 employees, and (3) generate cash in an amount that, by current projections, should be

21   sufficient to pay creditors in full or close to full.

22         The Sale is proposed in response to significant financial challenges facing this and other

23   hospitals, and comes after a considerable effort in searching for purchasers or strategic partners

24   conducted for the benefit of Creditors and the community the Debtors serve.

25                    **4.      Brief Explanation of Chapter 11**

26         Debtors filed a petition for Chapter 11 relief on February 4, 2014 (the "Petition Date").  In

27   Chapter 11, a debtor may reorganize its business or liquidate its assets under the protection of the

28   Bankruptcy Court. To facilitate this process, all efforts to collect prepetition claims from a debtor

014855\0013\10999220.21                                              2

and any secured creditor's attempt to foreclose on or seize property of the debtor are stayed during the pendency of the proceeding. A debtor in Chapter 11 is authorized to maintain possession of its assets as a "debtor-in-possession" and operate its business in the ordinary course. Among powers that a debtor-in-possession may exercise subject to Bankruptcy Court approval, a debtor may sell assets free and clear of liens, it may borrow money on terms approved by Bankruptcy Court, and it may assume or reject leases and executory contracts.

### B. Disclaimers and Limitations

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances of, and obtaining confirmation of, the Plan and may not be relied upon for any other purpose.

Creditors should note that amendments beneficial to one or more classes of claims without further impairment of other classes may be made to the Plan prior to confirmation. Amendments of that nature may be approved by the Bankruptcy Court at the confirmation hearing without re-solicitation of Creditors and membership interest holders.

The descriptions of the Plan contained in this Disclosure Statement are summaries and are qualified in their entirety by reference to the Plan. Each Creditor is encouraged to analyze the terms of the Plan carefully.

The statements contained in this Disclosure Statement are believed to be accurate as of the date of its filing unless another time is specified in the Disclosure Statement. They should not be construed as implying that there has been no change in the facts set forth since the date the Disclosure Statement was prepared and the materials relied upon in preparation of the Disclosure Statement were compiled. Counsel for the Debtors makes no representation as to the accuracy of the information contained in this Disclosure Statement.

This Disclosure Statement has been neither approved nor disapproved by the Securities and Exchange Commission or any state securities regulator, and neither the Securities and Exchange Commission nor any state securities regulator has passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

## C.    Definitions

### 1.    Defined Terms In the Plan

Various terms are defined in Article II of the Plan.  These defined terms are also used in the Disclosure Statement and have the same meaning in this Disclosure Statement as set forth in the Plan.

### 2.    Other Terms

The words "herein," "hereof," "hereto," "hereunder," and others of similar inference refer to the Disclosure Statement as a whole and not to any particular section, subsection, or clauses contained in the Disclosure Statement unless otherwise specified herein.  A term used herein or elsewhere in the Disclosure Statement that is not defined herein or in the Plan shall have the meaning ascribed to that term, if any, in the Bankruptcy Code or the Bankruptcy Rules.  The headings in the Plan are only for convenience of reference and shall not limit or otherwise affect the provisions of the Plan.

### 3.    Exhibits

All exhibits to the Plan and Disclosure Statement are incorporated into and are a part of the Plan and Disclosure Statement as if set forth in full herein.

## D.    Classification and Treatment of Claims

| Class | Status | Treatment Under Plan | Estimated Distribution |
|---|---|---|---|
| Class 1 (Allowed Bond-Related Claims) | Impaired | The Allowed Bondholder Claim will be allowed in the principal amount of $63,785,000 plus accrued interest, fees and expenses.  After application of reserves, the Allowed Bondholder Claim will be paid in full in Cash at Sale Closing or as soon as reasonably practicable thereafter.  In exchange, the Allowed Bond Redemption Premium Claim will be subordinated to Class 4 General Unsecured Claims. | 100% |

014855\0013\10999220.21

4

| Class | Status | Treatment Under Plan | Estimated Distribution |
|-------|--------|----------------------|------------------------|
| Class 2 (Banner Assumed Liabilities) | Unimpaired | The rights of the holders of Class 2 Claims shall not be affected by the Plan or Confirmation Order. Banner has agreed to assume these liabilities pursuant to the APA. | 100% |
| Class 3A (Allowed Cardinal Claim) | Impaired | The Allowed Cardinal Claim shall be paid in full as soon as practicable after the Effective Date. | 100% |
| Class 3B (Allowed Siemens Claim) | Impaired | The Allowed Siemens Claim shall be paid in full as soon as practicable after the Effective Date. | 100% |
| Class 3C (Allowed Baxter Claim) | Impaired | The Allowed Baxter Claim shall be paid in full as soon as practicable after the Effective Date. | 100% |
| Class 3D (Allowed Morgan Stanley Secured Claim) | Impaired | The Allowed Morgan Stanley Secured Claim shall receive the collateral securing the claim, *i.e.*, the Morgan Stanley Collateral, on the Effective Date. | 100% |
| Class 3E (Allowed Great Western Claim (Pavilion)) | Impaired | The Allowed Great Western Claim (Pavilion) shall be paid in full as soon as practicable after the Effective Date. | 100% |
| Class 3F (Allowed Great Western Claim (Urgent Care Center)) | Impaired | The Allowed Great Western Claim (Urgent Care Center) shall be paid in full as soon as practicable after the Effective Date. | 100% |
| Class 3G (Allowed First Financial Corporate Claim) | Impaired | The Allowed First Financial Corporate Claim shall be paid in full as soon as practicable after the Effective Date. | 100% |
| Class 4A (General Unsecured Claims Against CGRMC) | Impaired | Commencing on the Initial Distribution Date, Holders of Allowed Claims in Classes 4A, 4B, 4C and 4D will receive a *pro* | 100% |

| Class | Status | Treatment Under Plan | Estimated Distribution |
|---|---|---|---|
| | | *rata* distribution of funds available for distribution from the Creditor Trust after (a) the Reserves, (b) payment of Administrative Expenses, Priority Claims, and Tax Claims not otherwise contained in the Reserve, and (c) payment on account of Allowed Class 1 and Allowed Class 3 Claims. | |
| Class 4B (General Unsecured Claims Against RCSC) | Impaired | *See* Treatment of Class 4A above. | 100% |
| Class 4C (General Unsecured Claims Against RCPG) | Impaired | *See* Treatment of Class 4A above. | 100% |
| Class 4D (General Unsecured Claims Against CGRRC) | Impaired | *See* Treatment of Class 4A above. | 100% |
| Class 5 (Membership Interests) | Impaired | Class 5 Membership Interests shall be cancelled and shall not receive anything under the Plan. | 0% |

The estimated Distributions set forth above are based upon the Debtors' estimates of the Allowed Claims in each class. There is no guaranty that each Class will receive the distribution estimate above.

### E. Parties Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on the Chapter 11 Plan. Creditors whose Claims are not impaired by the Plan are deemed to accept the Plan under Bankruptcy Code § 1126(f) and are not entitled to vote. Further, a Holder of Claim or Interest that does not receive or retain any property under the Plan on account of such Claims or Interests is deemed to reject the Plan under Bankruptcy Code § 1126(g). Accordingly,

Classes 1, 3 and 4 are entitled to vote on the Plan. Class 2 (Banner Assumed Liabilities) is deemed to accept the Plan. Class 5 is deemed to reject the Plan.

### F. Voting Procedures, Confirmation Hearing, and Cramdown

#### 1. Classified Claims and Interests

After approval of the Disclosure Statement by the Bankruptcy Court, certain Creditors will have an opportunity to vote on the Plan. Voting will be by class as set forth in the Plan and described later in this Disclosure Statement. For classes containing more than one Claim or Interest, a class is deemed to have accepted the Plan if at least one-half of the Creditors in number holding at least two-thirds of the aggregate amount of Claims voting elect to accept the Plan.

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan. **For your vote to be counted, you must complete and sign your original Ballot and return it by 5:00 p.m. on _____, 2014, which is the last date set by the Court to vote on the Plan.**

#### 2. Confirmation Hearing

The Bankruptcy Court has set a hearing on Confirmation of the Plan and to consider objections to Confirmation, if any, for _____, 2014 at _:__ _.m. The Confirmation hearing will be held in Courtroom _____, Tucson, Arizona. At the hearing, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code.

#### 3. Cramdown

If any class of Claims or Interests fails to accept the Plan, the Bankruptcy Court may confirm the Plan in accordance with Bankruptcy Code § 1129(b) on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to any nonaccepting, Impaired Class. Because Class 5 Membership Interests are deemed to reject the Plan under Bankruptcy Code § 1126(f), the Debtors are seeking confirmation of the Plan pursuant to Bankruptcy Code § 1129(b).

## G.    Effect of Confirmation of the Plan

Confirmation of the Plan makes the Plan and its provisions binding on the Debtors, all Creditors, and other parties in interest, regardless of whether they have accepted or rejected the Plan.  As a result, Creditors may receive payment on their claims only in accordance with the Plan.  If confirmed, the estimated Effective Date of the Plan will be 15 days after the Bankruptcy Court enters the Confirmation Order, unless such order is the subject of a stay by the Bankruptcy Court.

## H.    Approval of the Disclosure Statement

A decision by the Bankruptcy Court to approve this Disclosure Statement under Bankruptcy Code § 1125 is a finding that the Disclosure Statement contains information of a kind and in sufficient detail to enable a reasonable, hypothetical investor typical of holders of impaired claims to make an informed judgment about the Plan and is not a recommendation by the Bankruptcy Court either for or against the Plan.

## II.    HISTORY AND ORGANIZATION OF THE DEBTORS

## A.    CGRMC

### 1.    Operations of the Hospital

CGRMC is an Arizona non-profit corporation that is exempt from federal income taxation under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended. CGRMC was incorporated in November 1981 and is sponsored by RCSC.

CGRMC operates a 177-licensed bed, general acute care hospital located in Casa Grande, Arizona (the "Hospital"). CGRMC's medical center campus includes the Hospital building, Desert Reflections Outpatient Imaging Center, four medical office buildings, and the Pavilion. CGRMC also operates a 12,500 square foot urgent care center (the "Urgent Care Center") at a site near the main campus.

CGRMC offers a broad range of services for acute care and ancillary services in both inpatient and outpatient settings, with a significant amount of outpatient services provided at the Urgent Care Center. CGRMC, in conjunction with RCPG, provides a wide range of medical

specialty services including cardiology, gastroenterology, gynecology, neurology, pediatrics, surgery, intensive care and urology.

CGRMC is licensed by the Arizona Department of Health Services through June 2015 and accredited by various organizations. CGRMC is accredited by Det Norske Veritas Healthcare, Inc. (DNV) through April 2014. CGRMC's mammographic imaging and ultrasound services are accredited by the American College of Radiology through September 2014 and October 2015, respectively. CGRMC's laboratory has been accredited by the College of American Pathologists through February 2014 and its sleep lab is accredited by the American Academy of Sleep Medicine.

CGRMC had net revenues of $98,748,100 in 2013 and $108,822,332 in 2012.

### 2. Mission

The Debtors' mission, as set forth in CGRMC's Articles of Incorporation, dated November 25, as amended, is as follows:

> The Corporation is organized and shall be operated exclusively for charitable, educational, and scientific purposes. The general nature of the business of the corporation and the character of the affairs which the corporation initially intends to conduct in the State of Arizona, shall be the care and nursing of the sick, providing means for their sustenance, alleviation of their distress and to preserve and restore health, to seek the cause and cure of diseases and to educate those who would serve humanity. In furtherance and not in limitation of the purposes for which the corporation is organized, solely for the above purposes and without otherwise limiting its powers, the corporation is empowered to exercise all rights and powers by the laws of Arizona upon nonprofit corporations.

In addition, CGRMC's mission and vision statements are as follows:

*Mission Statement*: We exist to make a positive difference in the lives of those we serve through compassion and excellence in patient care.

*Vision Statement*: To be the healthcare system of choice for the communities we serve.

### 3. Overview of Employees

CGRMC has approximately 800 employees, consisting of physicians, nurses and finance, IT, billing, collections, accounting, administrative, and technical personnel. The medical staff

includes approximately 165 physicians, 81% of whom are board certified in their specialty. The medical staff includes 11 hospitalists that are contracted through a third-party. CGRMC employs one anesthesiologist and its affiliate, RCPG, employs six physicians: two general surgeons, one general and vascular surgeon, one OB/GYN physician, one GYN physician and one neurologist. CGRMC also has contracts with five independent anesthesiologists and a group of five Certified Registered Nurse Anesthetists (CRNAs).

### 4. Senior Management

Senior management consists of Rona Curphy as Chief Executive Officer and President with an approximate annual base salary in the amount of $365,000 and Karen Francis as Chief Financial Officer with an approximate annual base salary in the amount of $300,000.

### B. **Background on Other Debtor Entities**

RCSC is an Arizona non-profit corporation that is exempt from federal income taxation under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended. RCSC was incorporated in 1997 for charitable and educational purposes, and has the purpose of benefiting, performing the functions of, and carrying out the purposes of the medical care in the community. RCSC is the sole member and sponsor of CGRMC, RCPG and CGRRC. The RCSC board of directors consists of five members (four independent members and one physician). As of the Petition Date, RCSC's management consists of Rona Curphy as President , Karen Francis as Chief Financial Officer, Cherie McGlynn as Chairman, David Fitzgibbons as Vice Chairman, and John Robert McEvoy as Secretary/Treasurer.

CGRRC is an Arizona non-profit corporation that is exempt from federal income taxation under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended. CGRRC was incorporated in 1989 with the purpose of, among other things, providing elderly and handicapped persons housing facilities and services specially designed to meet specific physical, social, and psychological needs. The organization's central purpose also included support for charitable, educational, and other exempt activities of CGRMC. CGRRC is the borrower on the loan for the Urgent Care Center utilized under Hospital operations but there has been no activity in this organization since 2005. As of the Petition Date, CGRRC's management consists of Rona Curphy

1  as President/CEO, Cherie McGlynn as Chairman, David Fitzgibbons as Vice Chairman, and John

2  Robert McEvoy as Secretary/Treasurer.

3  RCPG is an Arizona non-profit corporation that is exempt from federal income taxation

4  under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended.  RCPG was

5  incorporated in 2008 with the purpose of providing medical services, medical programs and

6  health care for the benefit of patients in the service area of Casa Grande, and to manage the

7  operations of employed physicians that had formerly been under CGRMC operations. As of the

8  Petition Date, RCPG's management consists of Rona Curphy as President/Chief Executive

9  Officer and Karen Francis as Chief Financial Officer.

10  **C.    Description of the Non-Debtor Affiliates**

11  Casa Grande Community Hospital Foundation, Inc. (the "Foundation") was formed solely

12  and exclusively for the promotion of fundraising, charitable programs and to receive donations

13  for the benefit of the CGRMC and its affiliates. The Foundation ensures that donors' intent is

14  carried out in use of the funds. The Foundation raises and provides funds for, among other things,

15  breast mammograms and diagnostics to uninsured women, pediatric clinic services, and

16  medications. Officers of the Foundation are David Fitzgibbons as Chairman, Robert McEvoy as

17  Secretary and Cherie McGlynn as Treasurer.

18  Regional Health Care Ventures, Inc. ("RHCV") was formed for the purpose of holding a

19  minority interest in the joint venture for providing cancer treatment services for Arizona. There

20  are no operations at this entity. Officers of RHCV are Cherie McGlynn as Chairman and Rona

21  Curphy as President.

22  **D.    Outstanding Debts**

23  **1.    Bond Debt**

24  CGRMC issued certain Hospital Revenue Refunding Bonds (Casa Grande Regional

25  Medical Center), Series 2001A, pursuant to the Bond Documents (as defined in the Plan) in the

26  aggregate principal amount of $41,485,000. CGRMC further issued certain Hospital Revenue

27  Refunding Bonds (Casa Grande Regional Medical Center), Series 2001B pursuant to the same

28  Bond Documents in the aggregate principal amount of $4,645,000. Finally, CGRMC issued

certain Hospital Revenue Bonds (Casa Grande Regional Medical Center) Series 2002A pursuant to the same Bond Documents in the aggregate principal amount $25,475,000. The outstanding principal due and owing on the bond obligations totals approximately $63,785,000.

To secure repayment of the Bonds, CGRMC granted liens on its interest in the "Casa Grande Hospital Site," all "Buildings and Improvements" thereon, all "Collateral," and all "Fixtures" as defined in the Bond Documents, which liens collectively may cover substantially all of CGRMC's assets, including real estate. The grant of liens on rights to payment from Medicare and similar programs which provide 70 percent of the Debtors' revenues, however, is subject to the federal Anti-Assignment Act. In addition, due to the nature of the Debtors' operating bank accounts, the lien on the Debtors' cash may be limited to identifiable proceeds of other collateral, reducing the scope of the lien. On November 18, 2013, the Bond Trustee with respect to the Bonds filed an amended UCC financing statement. To the extent that this financing statement was necessary to perfect security interests in CGRMC's personal property, the filing could be subject to review pursuant to Bankruptcy Code section 547.

The Plan provides that the Allowed Bondholder Claim, but not the Allowed Bond Redemption Premium Claim, will be paid in full on or about the Effective Date, notwithstanding any questions or issues regarding the full extent of the collateral securing the Bonds or whether any grants of security are subject to preference or other avoidance challenge. In consideration, the Allowed Bond Redemption Premium Claim shall be subordinate in payment to Class 4 General Unsecured Claims and shall be paid to the extent funds are available for distribution from the Creditor Trust after (a) the Reserves, (b) payment of Administrative Expenses, Priority Claims, and Tax Claims provided in Article IV of the Plan not otherwise contained in the Reserve, and (c) payment on account of Allowed Claims in Classes 1 (except for the Allowed Bond Redemption Premium Claim), 3, and 4.

### 2. Morgan Stanley Debt

In May 2005, CGRMC entered into several derivative financial agreements and transactions (collectively, and together with the Term Sheet (defined below), the "Morgan Stanley Documents and Transactions") with Morgan Stanley Capital Services LLC (f/k/a Morgan

Stanley Capital Services, Inc.) and/or Morgan Stanley & Co. LLC (f/k/a Morgan Stanley & Co. Incorporated) (collectively, "Morgan Stanley"), consisting of the ISDA Master Agreement, dated as of May 26, 2005, between CGRMC and Morgan Stanley Capital Services LLC (f/k/a Morgan Stanley Capital Services Inc.) (as subsequently amended and together with any schedules and exhibits thereto and confirmation thereunder), the Credit Support Annex to the schedule to the Master Agreement, dated as of May 26, 2005, between CGRMC and Morgan Stanley Capital Services LLC (f/k/a Morgan Stanley Capital Services Inc.) (as amended on April 1, 2010 and as subsequently amended and together with any schedules and exhibits thereto), the transactions entered into between CGRMC and Morgan Stanley under the ISDA Master Agreement, including those evidenced by the confirmations dated May 26, 2005 and bearing Morgan Stanley Reference Numbers AUD5K, AUD5J, AUD5M, AUD5N and AUD5P, the Debt Service Fund (Principal Account) Forward Delivery Agreement, dated as of May 26, 2005, by and among CGRMC, Wells Fargo Bank, National Association, as trustee, Morgan Stanley Capital Services LLC (f/k/a Morgan Stanley Capital Services, Inc.), and Morgan Stanley & Co. LLC (f/k/a Morgan Stanley & Co. Incorporated), the Debt Service Reserve Fund Forward Delivery Agreement, dated as of May 26, 2005, by and among CGRMC, Wells Fargo Bank, National Association, as trustee, Morgan Stanley Capital Services LLC (f/k/a Morgan Stanley Capital Services, Inc.), and Morgan Stanley & Co. LLC (f/k/a Morgan Stanley & Co. Incorporated), and the Debt Service Fund (Interest Account) Forward Delivery Agreement, dated as of May 26, 2005, by and among CGRMC, Wells Fargo Bank, National Association, as trustee, Morgan Stanley Capital Services, LLC (f/k/a Morgan Stanley Capital Services, Inc.), and Morgan Stanley & Co. LLC (f/k/a Morgan Stanley & Co. Incorporated).

As collateral under the Morgan Stanley Documents and Transactions, Morgan Stanley maintained a bank account in its name (the "Collateral Account," with funds in the Collateral Account that CGRMC was obligated to fund from time to time in accordance with the Morgan Stanley Documents and Transactions, the "Morgan Stanley Collateral"). The Debtors' books and records indicate that $752,372 is currently on deposit in the Collateral Account. CGRMC's obligations under the Morgan Stanley Documents and Transactions were otherwise unsecured.

On April 1, 2010, CGRMC and Morgan Stanley Capital Services LLC (f/k/a Morgan Stanley Capital Services Inc.) entered into that certain Term Sheet, which, among other things, (i) resolved the parties' disagreement as to CGRMC's obligations to post eligible collateral pursuant to the Morgan Stanley Documents and Transactions, and (ii) terminated transactions evidenced by the confirmations bearing Reference Numbers AUD5N and AUD5P (the "Term Sheet").

On February 7, 2014, Morgan Stanley delivered notices to CGRMC that events of default had occurred and were continuing under the Morgan Stanley Documents and Transactions and that Morgan Stanley was exercising its right to immediately terminate the remaining Morgan Stanley Documents and Transactions in accordance with their respective terms. On February 21, 2014, Morgan Stanley delivered to CGRMC a settlement statement (the "Morgan Stanley Settlement Statement") setting forth the amounts Morgan Stanley alleges are due and owing by the Debtors to Morgan Stanley under the Morgan Stanley Documents and Transactions.

Morgan Stanley's claims against the Debtors pursuant to the Morgan Stanley Documents and Transactions include: (i) a secured claim secured by and to the extent of the Morgan Stanley Collateral (the "Allowed Morgan Stanley Secured Claim") and (ii) a General Unsecured Claim for the remainder of the Debtors' outstanding obligations under the Morgan Stanley Documents and Transactions not secured by the Morgan Stanley Collateral, which Claim shall be Allowed in the amount of $3,877,640[2] (the "Allowed Morgan Stanley Unsecured Claim").

### 3. Equipment Lease Obligations

The Debtors have certain debt obligations on account of medical equipment leases by and between CGRMC and various medical equipment and equipment service providers including, but not limited to, Siemens Financial Services, Inc. and First Financial Corporate Leasing. As of the Petition Date, capital lease obligations in the aggregate are estimated to be $303,532. The Debtors intend to exercise a buyout with respect to all equipment as set forth in the respective leases under the Allowed Siemens Claim and the Allowed First Financial Corporate Claim, and sell the

---

[2] Pursuant to the Morgan Stanley Settlement Statement, Morgan Stanley asserted that it is owed $4,029,307 on account of the Allowed Morgan Stanley Unsecured Claim. The Debtors calculations indicate that Morgan Stanley is owed $3,877,640 on account of the Allowed Morgan Stanley Unsecured Claim. Morgan Stanley has consented to the Debtors' calculated amount.

014855\0013\10999220.21

14

equipment free and clear of liens to Banner. Based on the Debtors' books and records, the buyout costs with respect to Siemens Financial Services, Inc. total approximately $180,000, and the buyout costs with respect to First Financial Corporate Leasing total approximately $83,000.

### 4. Trade Debt

The Debtors' trade debt consists of unsecured vendor liabilities that, in the aggregate, approximate $6.0 million as of the Petition Date. The Debtors' trade debt is typical for that of a hospital -- debts for medical supplies and other goods and services necessary to provide patient care and maintain the hospital.

### 5. Bank Loans

The Debtors have two bank loans pursuant to a certain bank loan agreement, dated June 25, 2004, by and between RCSC and Sunstate Bank in the principal amount of $1,500,000 relating to the Pavilion; and a certain bank loan agreement, dated September 15, 2005, by and between CGRRC and Sunstate Bank in the principal amount of $1,440,000 relating to the Urgent Care Center. Great Western Bank now holds the beneficial interest with respect to these bank loans.

### E. Major Assets

The Debtors operate the Urgent Care Center located at 1676 E. McMurray Blvd. Casa Grande, AZ (Tax Parcel No. 505-66-002, 505-66-001). The bank loan agreement dated September 15, 2005 by and between Sunstate Bank and CGRRC provides a security interest against this real property for the benefit of Great Western Bank, the Holder of the Claim.

In addition to the Urgent Care Center, the Debtors own real property located at 950 N. Arizola Rd., Casa Grande, AZ 85122 ((Tax Parcel Nos. 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, 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, 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, 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, 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, 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). The bank loan agreement dated June 25, 2004 by and between Sunstate Bank and Regional Care Services Corp. provides a security interest against this real property for the benefit of Great Western Bank, the Holder of the Claim.

The Debtors own real estate, including property located at 1780 E. Florence Blvd. and 1800 E. Florence Blvd. The property located at 1800 E. Florence Blvd. (505-22-022C, 505-22-022D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, and 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, and 505-22-022B) is encumbered by two deeds of trust,

including one held by Wells Fargo and another held by Republic Bank. The property located at 1780 E. Florence Blvd. (Tax Parcel Nos. 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, 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, and 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) is comprised of three units (Unit 1, Unit 4, and Unit 6). Unit 4 is encumbered by a deed of trust originally held by Sunstate Bank.

Finally, the Debtors also own the following real properties: (i) property located at 1828 E. Florence Blvd. (Tax Parcel No. 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), and (ii) raw land (Tax Parcel Nos. 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 and 505-22-012C).[3]

The Debtors have nineteen bank accounts including twelve operating accounts, two savings accounts, and five collateral accounts. The Debtors' obligations under the Bond Documents are secured by cash in the Collateral Account at Wells Fargo & Company. The Debtors' obligations under the Morgan Stanley Documents and Transactions are secured only by and to the extent of the cash in the Morgan Stanley Collateral Account.

The Debtors' assets also include intercompany receivables and non-intercompany receivables. The four non-intercompany receivables include: (1) patient receivables; (2) rent receivables ; (3) receivable by Oasis Pavilion Nursing & Rehabilitation; and (4) pharmacy receivables. The Debtors anticipate full collection on the four non-intercompany receivables because the amounts are based on net estimated collectible amounts. The Allowed Cardinal Claim and the Allowed Bondholder Claim are secured by these accounts.

The Debtors also own building fixtures and equipment. Schedule 3.3 to the APA provides a list of encumbrances on the Debtors' building fixtures and equipment.

The Debtors hold inventory with an estimated value of $2,640,981. The Allowed Cardinal Claim and the Allowed Bondholder Claim are secured by inventory.

The Debtors' prepaid assets are comprised of the following: (i) prepaid insurance, (ii) prepaid service agreements, (iii) prepaid dues and subscriptions, (iv) prepaid accounts payable, and (v) prepaid software licensing and support. These prepaid assets are not likely to be recovered in a liquidation scenario.

---

[3] Property located at 2111 Sweetwater Drive (Tax Parcel No. 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) is owned by Casa Grande Community Hospital Foundation, Inc., a non-Debtor entity.

| | |
|---|---|
| 1 | Finally, the Debtors expect an estimated potential recovery in the amount of $480,505.95 |
| 2 | (plus costs and interest) from a pending litigation matter in front of the Ninth Circuit Court of |
| 3 | Appeals titled Regional Care Services Corporation Health and Welfare Employee Benefit Plan v. |
| 4 | Companion Life Insurance Company, United States District Court No. CV10-2597-PHX-LOA, |
| 5 | Ninth Circuit No. 12-16538. The basis of the lawsuit was to recover on a denied claim under a |
| 6 | stop loss policy. RCSC prevailed on its claim in district court and the matter has been fully |
| 7 | briefed at the Ninth Circuit, awaiting arguments. |
| 8 | **F.**     <u>**Other Litigation**</u> |
| 9 | The Debtors have a pending lawsuit brought by InterTech Computer Products, Inc. against |
| 10 | Casa Grande Regional MedicalCenter ("<u>CGRMC</u>") and Bret Huth.  In 2009, CGRMC entered |
| 11 | into an IT Managed Services Agreement with InterTech to provide remote helpdesk and vendor |
| 12 | management of CGRMC's computer systems.  In May 2010, Huth, an InterTech employee, was |
| 13 | assigned to be the primary InterTech technical support contact for CGRMC.  Because the |
| 14 | proposed renewal rates were excessive, CGRMC terminated the InterTech contract on April 30, |
| 15 | 2012 and posted an opening for the position to bring the services in house. Huth applied for the |
| 16 | position in June 2012 and was offered the position.  Before he commenced work, InterTech |
| 17 | intervened claiming that CGRMC's employment of Huth violated their Agreement.  Without |
| 18 | admitting fault, CGRMC withdrew the employment offer to Huth.  Notwithstanding, InterTech |
| 19 | filed suit on July 27, 2012 alleging that CGRMC breached the terms of its Agreement, which |
| 20 | caused immediate and irreparable harm and monetary damages.  InterTech also alleged causes for |
| 21 | breach of the implied covenant of good faith and fair dealing and aiding and abetting.   It is |
| 22 | CGRMC's position that the Agreement only prohibits solicitation of InterTech employees and the |
| 23 | posting of a job opening is not a solicitation, therefore it did not breach the terms of the contract |
| 24 | and the case has no merit.  In addition, CGRMC did not ultimately hire Huth. The parties |
| 25 | participated in a court ordered mediation on October 28, 2013. InterTech's demand for $138,000 |
| 26 | to settle was rejected by CGRMC. |
| 27 | **G.**     <u>**Events Leading to Chapter 11 Filing**</u> |
| 28 | **1.**     **Financial Challenges** |

1    The Arizona Health Care Cost Containment System ("AHCCCS") is Arizona's Medicaid

2    program. AHCCCS oversees contracted health plans in the delivery of health care to individuals

3    and families who qualify for Medicaid and other medical assistance programs.  AHCCCS,

4    through its contracted health plans, pays hospitals and other health care providers for inpatient

5    and outpatient services provided to AHCCCS members. Additionally, AHCCCS makes

6    supplemental payments to hospitals for different purposes and activities.

7    In 2011, AHCCCS's per diem reimbursement rates were reduced by more than ten

8    percent.  Effective October 1, 2011, AHCCCS eliminated reimbursement for AHCCCS-eligible

9    patients after the twenty-fifth day of any inpatient treatment at a hospital or long-term acute care

10    facility during the federal fiscal year from October 1st through September 30th.  AHCCCS also

11    eliminated coverage for otherwise eligible patients who do not have dependent children. These

12    changes resulted in a dramatic decrease in the Hospital's AHCCCS reimbursement for the

13    medical services it provides to these indigent patients.

14    CGRMC estimates that these changes resulted in a decline of its revenue in excess of $10

15    million from 2011 to 2013. These AHCCCS changes also resulted in decreases in supplemental

16    federal reimbursements linked to treatment of Medicaid-eligible patients of an additional $1

17    million annually.

18    Other external factors have also led to declining revenues including the industry-wide

19    migration of treatment from inpatient to outpatient settings (which are reimbursed at significantly

20    lower rates) and the 2% across the board reduction  in Medicare reimbursement rates due to the

21    federal budget sequestration. For the fiscal year ended June 30, 2013, the Hospital's net patient

22    service revenue declined by over 11% from 2011 levels. In the first six months of the current

23    fiscal year, inpatient admissions have declined by approximately 15%, compared to the same

24    period in the prior year resulting in a further reduction in revenue.  These changing dynamics

25    have substantially impacted CGRMC's operating margins and liquidity over the last two and one-

26    half years.

27

28

1    The Debtors have significant debt obligations, including its obligations under Bond

2    Documents in the aggregate principal amount of $63,785,000.  As a result of these financial

3    challenges, the Debtors violated certain bond covenants beginning on June 30, 2013.

4    The Debtors' business is very seasonal with patient volumes ramping up in the late Fall

5    and Winter and dropping off in the Spring, mirroring the population of the community.  As a

6    result of this seasonality, CGRMC's working capital needs increase significantly as it increases

7    its staffing levels, purchased supplies and services to provide care for patients well in advance of

8    receiving reimbursement from Medicare, AHCCCS, commercial insurers and other payers.

9    Notwithstanding the financial challenges that CGRMC faces, the local community's need

10   for its medical services is critical. CGRMC is the primary medical service provider in its service

11   area, with an overall market share of approximately 59% in 2012.  For the 12 months ended

12   June 30, 2013, CGRMC admitted over 7,600 patients and had over 58,000 emergency room and

13   urgent care visits.

14              **2.       Review of Strategic Options**

15   In the summer of 2013, CGRMC  commenced an intensive review of strategic options that

16   would ensure that CGRMC could continue providing quality health care to the Casa Grande

17   community and surrounding areas and that the Debtors' creditor obligations would be satisfied.

18   CGRMC and other hospitals who had been negatively impacted by the 2011 changes in

19   AHCCCS applied to the federal government for a provider tax assessment program that was

20   expected to generate an incremental $11,756,252 of net income to the Hospital for the last three

21   quarters of fiscal year 2013 and first two quarters in fiscal year 2014.  This application was not

22   approved by the appropriate government agencies.

23   CGRMC pursued a refinancing of its bonds through a federal program that would have

24   reduced its financing costs by over $2.5 million annually predicated on a successful

25   implementation of the provider tax assessment program. This refinancing effort ultimately failed

26   when the provider tax was not approved.

27   CGRMC also pursued a strategic partnership with a for-profit hospital system based in

28   Brentwood, Tennessee.  This effort ultimately failed.

In May 2013, CGRMC retained Hammond Hanlon Camp ("H2C"), a leading financial advisor and investment banker for hospital and health systems, to assess CGRMC's strategic and restructuring options. CGRMC concluded that it would have inadequate cash to continue operations and was forced to evaluate all strategic options, including filing for bankruptcy. Nevertheless, CGRMC continued to search for other strategic partners and options that would avoid insolvency.

In October 2013, on behalf of CGRMC, H2C contacted twenty potential strategic partners, fifteen of which received CGRMC's confidential information memorandum describing CGRMC, its operations, the Casa Grande market, and the Hospital's financial condition. Six of the recipients submitted an indication of interest in CGRMC, including Banner, another potential not-for-profit strategic partner, and four for-profit health systems. Ultimately, Banner and three other potential strategic partners, including Dignity Health, a California non-profit public benefit corporation, submitted proposed term sheets for a potential partnership.

The CGRMC Board considered numerous factors in choosing a strategic partner, including the likelihood of satisfying creditor claims, execution risk, transition of the assets from the Debtors as a non-profit to Banner as a non-profit, and CGRMC's mission, and determined that Banner presented the best option to satisfy the Debtors' creditor obligations and continue CGRMC's mission to provide and expand quality health care to the Casa Grande community and surrounding areas in a caring and compassionate environment. The CGRMC Board concluded that the terms proposed by Dignity Health were inferior to those proposed by Banner because of, among other reasons, the significant execution risk and the determination that the Banner transaction was more likely to continue CGRMC's mission to provide quality health care to the Casa Grande community. Moreover, Banner played a greater role in understanding and facilitating the federal review process under Hart-Scott Rodino.

### 3. About Banner

Banner is a non-profit health system headquartered in Phoenix, Arizona that operates 24 hospitals and health care facilities in Alaska, Arizona, California, Colorado, Nebraska, Nevada and Wyoming, in addition to the Banner Health Network and Banner Medical Group. It currently

1  employs approximately 36,000 individuals.  Banner provides a strong financial option for

2  CGRMC, with operating revenue of $5.0 billion, operating earnings before interest, taxes,

3  depreciation  and amortization of $683 million, cash and investments of $3.6 billion, almost 300

4  days cash on hand, and an Aa3/AA- rating.  Significantly, the substantial capital of reserves on

5  hand shows financial strength and ability to make needed capital investments.  As important,

6  Banner's non-profit mission of making a difference in people's lives through excellent patient

7  care, and reinvesting all of its earnings back into improving patient care, aligns directly with

8  CGRMC's mission.

9           **4.      Debtors' Current Financial Status**

10          According to the Debtors' books and records, as of February 28, 2014, CGRMC continues

11  to demonstrate the severe financial stress the Hospital is operating under.  The eight month fiscal

12  year operating loss equals $12.25 million, which is more than twice the loss from a year ago of

13  $5.8 million.  The current year loss also includes a one-time transfer from its Foundation of $1.45

14  million and an additional $1.47 million from Medicare Meaningful Use reimbursement.  There

15  will be no additional funds received from either of these sources the remainder of the fiscal year.

16  Without these two sources of funding this year, the Hospital's loss year to date would be $15.16

17  million.

18          The Hospital has written off $27 million in bad debts and charity.  Medicaid (AHCCCS)

19  expansion began in Arizona on January 1st, but will continue to be a very slow process as the

20  state AHCCCS program more than doubles its enrolled members over the next eighteen months.

21  As payments lag at least 60-90 days behind providing the services to patients, the Debtors do not

22  anticipate seeing any significant positive impact to their cash position for several months.  In

23  addition, the expansion does not eliminate the reimbursement cuts put into place in 2011 by

24  AHCCCS.  Those cuts reduced the payment rate by over 10% and limited inpatient Hospital

25  coverage payments to 25 days per year.

26          The Hospital had total unrestricted cash in the amount of $6.464 million available for use

27  on February 28th.  This includes $4.82 million of cash funding provided from Banner Health

28  since January.  Without the additional funding beginning in January, the Hospital would not have

been able to pay its payroll and would be completely insolvent at this time. The Hospital began delaying payments to its vendors last May. Prior to the bankruptcy filing many vendors began demanding payment for back invoices before they would deliver any more product or services. Since the filing, many additional vendors have now gone to COD or require a wire payment on the day of delivery to continue to provide goods. Even with the funding from Banner, trade accounts payable have still increased $3.8 million over the prior year.

The Hospital has not funded its mandatory Bond sinking fund payments of approximately $540,000 per month to preserve its cash since September 2013. This is a default under the Bond covenants as are its ongoing failure to meets its debt coverage ratio and required days of cash on hand ratio.

The Hospital has only expended $1.5 million for its capital needs the past nineteen months. The industry standard for capital expenditures in Hospitals is to spend at least as much as current year depreciation to prevent the aging of the plant and equipment. This would have required total capital expenditures during this same nineteen month period of $9.5 million. As a result, the Hospital's plant and equipment is rapidly aging. During this time, capital dollars have only been expended for two primary purposes: (1) when a piece of existing equipment breaks and cannot be repaired because the item is so old it is unserviceable, or the repair costs don't make sense in relation to the new purchase cost; and (2) additional investment has been required in information technology to enable the Hospital to continue to qualify for meaningful use dollars, which substantially exceed the cost of investment. If meaningful use is not met by a Hospital by 2015, Medicare will begin reducing payments.

Were a significant piece of Hospital equipment to break today, there are no dollars available to replace it and there is no financing available due to the current financial situation. This has been the situation for over a year. An example of this is the Hospital's cardiac cathertization laboratory equipment. This equipment is more than fourteen years old, has gone down unexpectedly multiple times the past year with various part failures, and will cost $2 million to replace. This equipment provides a much needed service within the Community and has saved many lives.

# III.    DESCRIPTION OF PLAN TERMS

## A.    Description of the Plan and Means of Implementation

The entire text of the Plan has been provided with this Disclosure Statement, and a general overview of the Plan is provided in Article I.  The following is a summary of certain provisions of the Plan; however, this summary is not comprehensive.  The Plan and not the Disclosure Statement is the legally operative document that controls the relationship between the Debtors and their Creditors.  Therefore, the Plan should be read carefully and independently of this Disclosure Statement.  Creditors are urged to consult with counsel and other professionals in order to fully resolve any questions concerning the Plan.

## B.    Plan Summary

The Plan proposes two basic sets of transactions.  First, the Debtors would sell substantially all of their assets to Banner.  Second, the net sales proceeds would be disbursed out of escrow to pay the Allowed Bondholder Claim in the compromised amount, with the balance placed in a trust for the benefit of creditors and distributed in accordance with their amounts, lien rights or statutory priority.  If there are disputes as to claim amounts or other relevant matters, such disputes may be brought before the Bankruptcy Court for determination,

## C.    Banner Transaction

### 1.    Overview

A copy of the Asset Purchase Agreement, by and between the Debtors, as sellers, and Banner, as purchaser, dated as of February 4, 2014, and as may be amended, modified or supplemented from time to time (the "APA"), is attached as Exhibit A to the Plan.  The details of the transaction set forth in the APA and its specific terms control.   By way of a general description, however, Banner and the Debtors agreed that Banner would acquire, among other things, substantially all of the Debtors' assets with the exception of certain excluded assets (as more specifically set forth in the APA, the "Transferred Assets") and would assume certain liabilities.

Banner will pay Debtors cash equal to the lesser of (A) the aggregate amount necessary to pay Allowed Claims against the Debtors in full after payment of allowed, unpaid pre-

confirmation expenses of the bankruptcy and post-confirmation bankruptcy expenses approved by Banner or approved by the Court, excluding postpetition interest on unsecured claims and excluding all claims of Banner, or (B) $87,000,000 minus certain paid time off obligations for employees who will work for Banner after the Sale Closing and certain pre-Closing taxes and also certain Cost Report liabilities of the Debtors (the "Purchase Price"). At Closing, Banner will deliver an amount the parties determine under alternative (B) into escrow. The escrow agent will record documents and disburse the funds. The amount necessary to pay the Allowed Bondholder Claim will be paid out of escrow and the balance will be disbursed to the Creditor Trust to be administered and disbursed in accordance with the APA, the Plan, and the Confirmation Order. Upon payment in full of certain bankruptcy expenses and Allowed Claims, the Creditor Trust will return any remaining cash to Banner.

In addition to the cash payment, prepetition and postpetition loans that Banner extended to the Debtors to sustain hospital operations and allow the Chapter 11 Cases to proceed, in a total principal amount up to $9,507,845, will be deemed satisfied upon the Sale Closing.

## 2. Conditions to Closing

Pursuant to Section 7.1(a)(iii) of the APA, Banner had the right to terminate the APA any time up to and including February 28, 2014 if it determined, based on due diligence or otherwise, that it was no longer commercially reasonable to proceed to Closing. *See* APA at § 7.1(a)(iii). That date has passed and Banner has not exercised its option to terminate. Accordingly, Banner may only terminate the APA, without the consent of the Debtors, under three scenarios: (i) if a condition to Banner's obligation to close, as set forth in Section 6.1 of the APA, is not satisfied; (ii) if an Action (as defined therein) is commenced by a governmental authority under applicable federal or state antitrust law seeking to enjoin, modify or otherwise prohibit the Sale; and (iii) if the Sale does not close by June 30, 2014. *Id*. at § 7.1.

The conditions to Banner's obligation to close, provided under Section 6.1 of the APA, include: (i) the representations and warranties made by the Debtors are true and accurate, and the covenants and obligations of the Debtors have been performed; (ii) there is no stay of the Confirmation Order in effect and no injunction, restraining order proceeding or regulation in

effect that enjoins or prohibits the Sale; (iii) all governmental and third-party approvals necessary for consummation of the Sale have been obtained; (iv) any consents necessary to transfer the Transferred Assets have been obtained; (v) all Encumbrances other than Permitted Encumbrances (as those terms are defined in the APA) on the Transferred Assets have been released; and (vi) the Confirmation Order shall have been entered in a form and substance reasonably acceptable to Banner. The Debtors are confident that each of the conditions to Banner's obligation to close will be met.

### 3.     Purchase and Sale

Subject to the terms and conditions of the APA, and pursuant to the Plan, Banner will purchase, and the Debtors will sell, the Transferred Assets on the Effective Date or at a later date consistent with the terms of the APA. The Plan further provides that (i) Banner and the Debtors shall perform the terms and conditions of the APA, and (ii) upon the Effective Date and subject to the conditions of the APA, the Debtors are authorized and directed to execute, deliver, perform under, consummate and implement the APA, together with all additional instruments and documents reasonably necessary or desirable to implement it.

The Plan provides for a private sale to Banner. The Debtors do not intend to hold a public auction for the Transferred Assets. Dignity Health, an unsuccessful bidder whose proposal the Debtors decided not to pursue, has acquired roughly $950 in claims in order to obtain standing to be heard in these Cases. Dignity Health has argued, among other things, that a private sale to Banner not subject to auction is improper. The Debtors are aware of no statute or rule requiring the Sale be subject to auction, and none have been cited by Dignity. The Debtors believe that a marketing and selection process additional to the one that was conducted prior to the commencement of these Cases would not be in the best interests of creditors nor would it serve to further CGRMC's mission. Several factors inform the Debtors' judgment in that regard. Proceeds from the Sale to Banner are anticipated to pay all Allowed Claims in full. The Debtors have made significant progress with Banner toward closing the transaction, and Banner is prepared to close, assuming all the conditions to closing are satisfied, once the confirmation order becomes final. The Debtors are confident that all conditions to Banner's obligation to close will

be satisfied.  And discretionary regulatory approvals necessary to effectuate the Sale have occurred with respect to the Sale to Banner, leaving only non-discretionary actions still to be completed (e.g. issuance of a new hospital license and the like).  To reopen the process to other potential purchasers could provide Banner incentive and the legal right to terminate the APA.  Moreover, the sale to any party other than Banner would necessarily involve significant continued operating and bankruptcy costs, risk, delay, and incremental (unfunded) costs as those regulatory approval processes would start over, including the 90-day notice requirement under the Day Act, and no other potential purchaser has undertaken material diligence efforts.  Accordingly, the Debtors believe that the Sale to Banner, as provided for under the Plan, is in the best interests of creditors and the estates.

### 4. Privacy Ombudsman

On March 25, 2014, the United States Trustee for the District of Arizona filed a motion seeking appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code.  The Debtors conditionally do not oppose the appointment of such an ombudsman.  If appointed, the ombudsman would report on whether the Sale to Banner, which includes the sale of "personally identifiable information", complies with the Debtors' privacy policy or non-bankruptcy law.  To assist in this process, Banner has filed with the Court a declaration outlining its own privacy policies.

### 5. Corporate Authority

The Plan and Confirmation Order shall constitute full corporate authorization to execute and perform the APA.

### 6. Transfer Free and Clear

Pursuant to the Plan and Bankruptcy Code sections 363(f) and 1141(c), the sale and transfer of the Transferred Assets to Banner shall be free and clear of all claims and interests in such Transferred Assets, including liens, claims, interests, obligations and encumbrances whatsoever, held by Creditors or members of the Debtors.   Liens shall attach to the Sale Proceeds in the same validity, scope and priority as existed against the Transferred Assets and shall be held in the Secured Claim Reserve pending distribution by the Creditor Trustee.

014855\0013\10999220.21

26

## 7.    Banner Assumes No Liability

Except for the Assumed Liabilities (as defined in the APA), Banner shall assume no liability to any Creditor of the Debtors by virtue of the transactions provided for in the Plan and the APA under any theory of contract, tort or doctrine of successor liability.  Banner shall be deemed not to be a successor to the Debtors for purposes of the doctrine of successor liability. Upon the Effective Date and the closing pursuant to the APA, each and every holder of a claim against the Debtors shall be permanently enjoined from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or encumbrance against Banner or the Transferred Assets.

## 8.    Employment Arrangements

As of the date of execution of the APA, and except to the extent provided under Section 5.8(e) of the APA, no member of the senior management team had received any promise by Banner regarding future employment or future compensation. As of March 12, 2014, Banner informed Ms. Curphy of its intent to continue her role under the same position, with the same responsibilities, and the same compensation structure with the exception of her transition into the benefits plan that Banner maintains for employees.

## 9.    Purchase Price

(i)    **Cash Purchase Price.**  As generally described in the Overview above and set forth in detail in the APA, the Cash Purchase Price payable subject to the terms of the APA shall be paid to an escrow agent, who will pay the Allowed Bondholder Claim and disburse remaining funds to the Creditor Trust established pursuant to Section 9.01 of the Plan.  Upon resolution of all Allowed and Disputed Claims, completion of distributions thereon and payment of the expenses of the Creditor Trust, all Professional Fees, and any fees due to the United States Trustee under 28 U.S.C. § 1930, and the Allowed Bond Redemption Premium Claim, any remaining funds shall be returned to Banner.

(ii)     **Loan Forgiveness.**  Pursuant to the Plan and in accordance with the APA, any and all obligations under the Prepetition Bridge Loan and the DIP Loan shall be deemed forgiven upon the Sale Closing.

**10.     Professional Fees Reserve**

As provided in and subject to the terms of the DIP Loan, on the Effective Date Banner shall advance DIP Loan funds as part of the Carve-Out in an amount equal to the difference of (i) the cumulative amounts appearing in the Budget for professional fees and disbursements as of the Effective Date less (ii) the cumulative amounts actually funded for payment of Professional Fees and disbursements as of such date.  The DIP Loan advance shall be deposited into a separate account maintained by the Creditor Trustee (the "Professional Fees Reserve Account") and used exclusively for payment of allowed professional fees and disbursements incurred by Borrower or any committee appointed pursuant to 11 U.S.C. § 1102 prior to the Effective Date.  In the event any balance remains in the Professional Fee Reserve Account after full payment of all such allowed professional fees and disbursements, such balance shall be returned to Banner.

**D.     Treatment of Claims**

The Plan provides claims will be treated based upon their type, as follows:

**1.     Administrative Expense Claims**

The deadline for filing an administrative expense claim (other than post-petition operating expenses or professional fees) (an "Administrative Expense Claim") shall be 30 days after the Effective Date.  Except to the extent any entity entitled to payment of an Allowed Administrative Expense Claim has received payment on account of such Claim prior to the Effective Date, each Holder of an Allowed Administrative Expense Claim shall receive, in full and final satisfaction of its Allowed Administrative Expense Claim, Cash in an amount equal to the amount of such Allowed Administrative Expense Claim, by the later of (i) the date that is 14 days after the Effective Date or (ii) the date that is 14 days after the Administrative Expense Claim is Allowed. Notwithstanding the foregoing, the Debtors are permitted to pay administrative expense claims arising from the ordinary course of business without the need for application or court order.

The estimated administrative expenses and fees to be paid for professionals are provided in further detail in the budget attached hereto as Exhibit B (the "Budget"). Based on the progress of these Cases, the Debtors currently estimate that the Plan Effective Date may occur on or around May 30, 2014. Assuming a May 30, 2014 Effective Date, the Budget provides for roughly $3.7 million in administrative expenses and fees to be paid for professionals for the entire duration of these Cases, *i.e.*, the Petition Date through the Effective Date. That amount does not include a success fee payable to H2C, which is the greater of $800,000 or 2% of the consideration received upon completion of the Sale closing. The $3.7 million does include roughly $250,000 for fees of a creditors' committee, although one has not yet (and may not be) appointed. To the extent the Effective Date is delayed beyond May 30, 2014, administrative expenses and fees would increase, as set forth in the Budget. The Debtors believe that these administrative expenses and fees are commensurate with those that would be incurred if the Sale were to occur outside of bankruptcy.

### 2. Tax Claims

Except to the extent any entity entitled to payment of any Allowed Tax Claim has received payment on account of such Claim prior to the Effective Date, each Holder of an Allowed Tax Claim shall receive, in full and final satisfaction of its Allowed Tax Claim, Cash in an amount equal to the amount of such Tax Claim within 14 days after the Effective Date.

### 3. Professional Fees

Professionals retained by the Debtors or the Committee under §§ 327 of the Bankruptcy Code and to be compensated pursuant to §§ 327, 328, 330, 331, or 503(b)(2) or (4) of the Bankruptcy Code ("Professionals") seeking payment of professional fees or reimbursement of expenses incurred through and including the Effective Date under §§ 330(a) and 503(b)(2), of the Bankruptcy Code ("Professional Fees") shall file their respective final applications on or before the date that is 60 days after the Effective Date, unless otherwise directed by the Court.

Professionals include, but are not limited to: (i) Brownstein Hyatt Farber Schreck, LLP, the Debtors' bankruptcy counsel; (ii) Mesch Clark & Rothschild, P.C., local bankruptcy counsel; (iii) Grant Thornton LLP, the Debtors' financial advisor; (iv) Hammond Hanlon Camp LLP, the

Debtors' investment banker; (v) antitrust counsel; (vi) Epiq Bankruptcy Solutions, Inc., the Debtors' claims agent; and (vi) any Professionals retained by the Committee, if one is appointed. The Debtors estimate that the fees of the Professionals through the Effective Date of the Plan will not exceed the amounts budgeted by the Debtors.

**4.      Priority Claims**

Each holder of a Priority Claim, if any, shall receive, in full and final satisfaction of its Priority Claim, Cash in an amount equal to the Allowed Amount of such Priority Claim within 14 days after the Effective Date.

**5.      Statutory Fees**

On or before 30 days after the Effective Date, the Creditor Trustee shall make all payments required to be paid the U.S. Trustee pursuant to § 1930 of Title 28 of the United States Code. All fees payable pursuant to § 1930 of Title 28 of the United States Code after the Effective Date shall be paid by the Creditor Trustee on a quarterly basis until these Cases are closed, converted, or dismissed.

**6.      Classified Claims**

The remaining Claims and Interests are divided into 5 Classes.

(i)      <u>Class 1:  Allowed Bond-Related Claims</u>

As of the Effective Date, the Allowed Bondholder Claim shall be deemed Allowed for all purposes in the aggregate principal amount of $63,785,000, plus (ii) accrued interest thereon under the Bond Documents through the Confirmation Date, plus (iii) the reasonable fees and expenses of the Master Trustee and Bond Trustee, respectively, and their respective counsel and advisors in the amounts set forth in the Confirmation Order. By agreement, the Allowed Bondholder Claim does not include the Allowed Bond Redemption Premium Claim.

Also as of the Effective Date, the Master Trustee and the Bond Trustee shall be deemed to have applied all cash and cash equivalents held by each to reduce the aggregate amount of Allowed Bondholder Claim. According to the Debtors' books and records, this amount is estimated to be $6.1 million. The remaining amount of the Allowed Bondholder Claim shall be paid through escrow at Sale Closing or as soon thereafter as reasonably practicable. The Allowed

Bond Redemption Premium Claim shall be subordinated to the Class 4 General Unsecured Claims and shall be paid if, and after, Allowed Claims in Classes 1 (except for the Allowed Bond Redemption Premium Claim), 3, and 4 are paid in full. This treatment of the Allowed Bondholder Claim and the Allowed Bond Redemption Premium Claim shall be in full and final satisfaction of the Allowed Bondholder Claim, the Allowed Bond Redemption Premium Claim, any and all Claims of the Bond Trustee, the Master Trustee, and all Holders of the Bonds, and all Claims in respect of, arising out of, or related to the Bond Documents.

(ii)      <u>Class 2: Banner Assumed Liabilities</u>

The rights of the Holders of Class 2 Claims shall not be affected by the Plan or Confirmation Order. Banner has agreed to assume these liabilities pursuant to the APA.

(iii)      <u>Class 3: Secured Claims</u>

**Class 3A.** Class 3A consists of the Secured Claim of Cardinal Health. According to the Debtors' books and records, this Claim totals approximately $1.2 million. The Allowed Cardinal Claim shall be paid in full as soon as practicable after the Effective Date.

**Class 3B.** Class 3B consists of the Secured Claim of Siemens Financial Services, Inc. According to the Debtors' books and records, this Claim totals approximately $434,000, which Secured Claim consists of total amounts due, and the fair market value buyout amount for all equipment as set forth in, the aforementioned leases. The Allowed Siemens Claim shall be paid in full as soon as practicable after the Effective Date.

**Class 3C.** Class 3C consists of the Secured Claim of Baxter Healthcare Corp. According to the Debtors' books and records, this Claim totals approximately $1,000. The Allowed Baxter Claim shall be paid in full as soon as practicable after the Effective Date.

**Class 3D.** Class 3D consists of the Allowed Morgan Stanley Secured Claim. Morgan Stanley has two claims in these Cases: (i) the Allowed Morgan Stanley Secured Claim, which is secured by and to the extent of the Morgan Stanley Collateral, and (ii) the Allowed Morgan Stanley Unsecured Claim, which represents the unsecured remainder of the Debtors' outstanding obligations to Morgan Stanley under the Morgan Stanley Documents and Transactions. On the Effective Date, Morgan Stanley shall receive, in full satisfaction of the

014855\0013\10999220.21

31

Allowed Morgan Stanley Secured Claim, the Morgan Stanley Collateral.  The Allowed Morgan Stanley Unsecured Claim shall be treated as an Allowed Class 4A General Unsecured Claim under the Plan.  This treatment of the Allowed Morgan Stanley Secured Claim and the Allowed Morgan Stanley Unsecured Claim shall be in full and final satisfaction of (i) the Allowed Morgan Stanley Secured Claim, (ii) the Allowed Morgan Stanley Unsecured Claim, and (iii)  any and all Claims in respect of, arising out of, or related to the Morgan Stanley Documents and Transactions.

**Class 3E.**   Class 3E consists of the Secured Claim of Great Western Bank. According to the Debtors' books and records, this Claim totals approximately $700,000.  The Allowed Great Western Claim (Pavilion) shall be paid in full as soon as practicable after the Effective Date.

**Class 3F.**   Class 3F consists of the Secured Claim of Great Western Bank. According to the Debtors' books and records, this Claim totals approximately $700,000.  The Allowed Great Western Claim (Urgent Care Center) shall be paid in full as soon as practicable after the Effective Date.

**Class 3G**.   Class 3G consists of the Secured Claim of First Financial Corporate Leasing. According to the Debtors' books and records, this Claim totals approximately $149,000, which Secured Claim consists of total amounts due under, and the fair market value buyout amount of the equipment as set forth in, the aforementioned lease. The Allowed First Financial Corporate Claim will be paid in full as soon as practicable after the Effective Date.

(iv)    Class 4:  General Unsecured Claims

Commencing on the Initial Distribution date, Holders of Allowed Claims in Classes 4A, 4B, 4C, and 4D will receive a *pro rata* distribution of funds available for distribution from the Creditor Trust after (a) the Reserves, (b) payment of Administrative Expenses, Priority Claims, and Tax Claims not otherwise contained in the Reserve, and (c) payment on account of Allowed Class 1 and Allowed Class 3 Claims.  According to the Debtors' books and records, Debtors

anticipate the Allowed Class 4 Claims total roughly $16.1 million.[4]  The Debtors anticipate that Allowed Class 4 Claims shall be paid in full under the Plan.  Disputed claims will be paid on a *pro rata* basis from the Reserve held back to account for such Disputed Claim to the extent ultimately Allowed.   If Holders of Allowed Claims are not paid in full on the Initial Distribution Date or upon Allowance of their Claims, and cash remains after all Claims are Allowed or Disallowed, and all remaining costs to wind down the bankruptcy estates are paid or arranged to be paid, an additional *pro rata* distribution will be made to Holders of Allowed Claims in Classes 4A, 4B, 4C, and 4D up to the full amount of their Allowed Claims, without postpetition interest.

Pursuant to the APA, the cap on the Purchase Price described in Section III.C.1 of this Disclosure Statement is projected to provide for payment of Allowed Class 4 Claims in full but does not provide for payment of interest accruing on such Claims after the Petition Date.  Section 502(b) of the Bankruptcy Code, which governs allowance of claims in bankruptcy cases, generally disallows claims for post-petition interest.  Thus, while the Plan is expected to provide for payment of Allowed Claims in full, the Plan does not provide for payment of post-petition interest to unsecured creditors.

Bankruptcy Courts have, in limited circumstances, required payment of post-petition interest in Chapter 11 cases.  Pursuant to Bankruptcy Code section 726(a)(5), when a bankruptcy estate administered pursuant to Chapter 7 of the Bankruptcy Code has assets available after payment of expenses of administration and payment of allowed claims in full, among other things, then unsecured creditors would receive payment of post-petition interest "at the legal rate" to the extent funds are available.  In this case, the unsecured Allowed Bond Redemption Premium Claim will be paid after payment of unsecured creditors without interest and other costs and expenses, because of the subordination provisions of the settlement described in Section VI.D. of

---

[4] The estimated total Allowed Claims for Class 4 is (i) derived from the Schedules filed with the Court, and (ii) also includes, among other things, anticipated damages arising from rejection of executory contracts and/or unexpired leases. Based on the Debtors' books and records, the Debtors do not believe any unsecured claims exist in Class 4D (General Unsecured Claims Against CGRRC). CGRRC simply owns real estate and does not otherwise generate separate revenue or debts. However, to the extent there are unsecured claims in Class 4D, they will receive distributions on par with Classes 4A, 4B, and 4C.

this Disclosure Statement. It is possible that there would be no remaining funds thereafter to pay interest to holders of unsecured claims in any event.

The provision for payment of post-petition interest has been incorporated into requirements for Chapter 11 plan confirmation pursuant to the "best interest" test in section 1129(a)(7), which requires that a plan of reorganization provide a return to creditors who have not voted in favor of the plan at least as much return on account of their claims as such creditor would receive in a hypothetical liquidation under Chapter 7 of the Bankruptcy Code. In the present case, the liquidation analysis attached as Exhibit D shows that creditors would receive substantially less than their Allowed Claim amounts in a Chapter 7 liquidation. Therefore, on the facts of these Chapter 11 Cases, the Debtors do not believe that section 726(a)(5) would provide for post-petition interest on Allowed Claims. In any event, the "legal rate" of interest accrual provided in section 726(a)(5) has been interpreted to refer to the federal judgment rate. *See Onink v. Cardelucci (In re Cardelucci)*, 285 F.3d 1231, 1235-36 (9th Cir. 2002). The federal judgment rate is currently 0.12% per annum. At that rate, post-petition interest would amount to less than 0.05% of a creditors Allowed Claim.

(v)     <u>Class 5: Membership Interests</u>

Class 5 Membership Interests shall be cancelled and shall not receive anything under the Plan.

**E.     <u>Executory Contracts and Unexpired Leases</u>**

**1.     Executory Contracts and Unexpired Leases Assigned to Banner**

(i)     **Contracts and Leases to be Assigned**

Upon the Sale Closing, the executory contracts and unexpired leases listed on Exhibit B to the Plan (to be updated prior to the Confirmation Hearing with respect to any contracts or leases entered into by the Debtors after the Petition Date) shall be assumed and assigned to Banner (the "<u>Banner Assigned Contracts</u>)."

(ii)     **Defaults**

The cure amounts under each Banner Assigned Contract shall be the amount set forth in Exhibit B to the Plan. Final cure amounts under each Banner Assigned Contract shall be the

amount set forth in the Confirmation Order after such notice to counterparties and opportunity for

hearing as ordered by the Court. To the extent such default is monetary, the counterparty to the

applicable Banner Assigned Contract shall receive payment in Cash as soon as practicable after

the Effective Date from the Creditor Trustee or as otherwise agreed between Banner and the

counterparty to the contract, in an amount equal to the final cure amount less any payments made

during these Chapter 11 Cases on account thereof in accordance with Bankruptcy Court approval.

Upon assignment, Banner shall have no liability in respect of any default that occurred prior to

the assignment.

(iii)     **No Further Liability**

After assignment, neither any of the Debtors, nor the Creditor Trust, shall have any

liability in respect of the Banner Assigned Contracts.

**2.     Assumption or Rejection of Executory Contracts and Unexpired Leases**

Pursuant to §§ 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and

unexpired leases that exist between the Debtors and any party that have not been previously

assumed pursuant to an order of the Bankruptcy Court or are not a Banner Assigned Contract,

shall be deemed rejected on the Effective Date.

**3.     Claims Based on Rejection of Executory Contracts or Unexpired Leases**

With respect to Claims arising from the rejection of executory contracts or unexpired

leases pursuant to the Plan, the bar date to file Proofs of Claim shall be 15 days after the Effective

Date and all such Proofs of Claim must be filed during that time so that appropriate Reserves may

be calculated. Any Claim arising from the rejection of an executory contract or unexpired lease

pursuant to the Plan for which a Proof of Claim is not timely filed within that time period shall be

forever barred from assertion against the Debtors officers, directors or agents of the Debtors, the

Estates, its successors and assigns, or its assets and properties, unless otherwise ordered by the

Bankruptcy Court or as otherwise provided herein.

### F. Anticipated Litigation; Waiver of Avoidance Claims

The Debtors do not anticipate any litigation. Pursuant to the Plan, upon the Effective Date and conditioned upon the Sale Closing, all Avoidance Claims shall be deemed waived. All other Causes of Action shall be assigned to the Creditor Trustee (discussed below) as the representative of the Estates. Pursuant to the terms of the Plan and as discussed in more detail below, various parties associated with these Cases, *i.e.*, the Released Parties (defined below), will receive releases from all Causes of Action other than those related to criminal conduct, willful negligence or gross misconduct.

Among potential Avoidance Claims that would not be pursued would be possible challenges to the security interests in the Debtors' personal property securing repayment of the Bonds and in the Debtors' cash. Pursuit of Avoidance Claims would result in a net reduction of recoveries to unsecured creditors, even if the elements under the particular claim exist, simply due to potential defenses and legal fees associated with litigating such claims.

Further, the Debtors made payments of approximately $24,000,000 during the ninety days prior to the Petition Date. The vast majority of these transfers were made in the ordinary course of business. Any other transfers made during this period likely have other defenses under 11 U.S.C. §547. However, the Debtors have not conducted an exhaustive review.

The Debtors believe that waiver of avoidance claims is appropriate given the extremely high payouts proposed in the Plan; pursuit of such claims would create unnecessary delay and expense, and could reduce ultimate recoveries.

### G. Feasibility and Distributions to Creditors

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless the plan calls for liquidation. The Plan calls for (i) the sale of substantially all of the Debtors' assets to Banner pursuant to the terms of the executed APA, and (ii) subsequent wind-down of the Estates by the Creditor Trustee. The Debtors have analyzed their ability to meet their obligations under the Plan. The APA has already been executed and there has been significant progress towards a Sale closing. As of March 12, 2014, all regulatory approval and waiting periods have been

satisfied. The parties have also received premerger clearance under Hart-Scott Rodino. The Debtors expect to get to closing two weeks after the Confirmation Date. Banner has agreed, pursuant to the DIP Loan, to provide the Debtors with sufficient debtor-in-possession financing to operate their businesses until the estimated Sale Closing date. The Purchase Price is anticipated to be sufficient to pay all Allowed Claims in these Cases in full. Therefore, the Debtors anticipate being able to make all payments required under the Plan. Accordingly, the Debtors believe the Plan satisfies the feasibility requirement of the Bankruptcy Code. Moreover, the Plan calls for an orderly wind-down of the Estates after the Sale Closing, which, by definition, satisfies the feasibility requirement.

### H. Federal Income Tax Consequences to Creditors

Any tax advice contained in this Disclosure Statement is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding tax-related penalties under the Internal Revenue Code of 1986, as amended. Any tax advice contained in this Disclosure Statement was written to support the promotion of the transactions described in this Disclosure Statement.

The following discussion is not intended as a substitute for professional tax advice, including the evaluation of recently enacted and pending legislation, since recent changes in the federal income taxation of reorganizations under the Bankruptcy Code are complex and lack authoritative interpretation. The Debtors have not received, nor will they request, a ruling from the IRS as to any of the tax consequences of the Plan with respect to Holders of Claims. The Debtors assume no responsibility for the tax effect that Confirmation and receipt of any distribution under the Plan may have on any given creditor or other party in interest. The brevity of the following discussion requires omission of matters that might affect one or more Holders of Claims against the Debtors depending upon their circumstances. **Accordingly, the Debtors recommend that Creditors and other parties in interest consult with their own tax advisors concerning the federal, state and local tax consequences of the Plan**.

Creditors may be required to report income or may be entitled to a deduction as a result of implementation of the Plan.

014855\0013\10999220.21

37

To the extent a Creditor receives, or expects to receive, less pursuant to the Plan than the Creditor's basis in the claim to which such amount relates, the Creditor may be permitted to claim a bad debt deduction. The amount, timing and character of the deduction will depend, among other things, upon the Creditor's tax accounting method for bad debts, the Creditor's tax status, the nature of the Creditor's claim, whether the creditor receives consideration in more than one year, and whether the creditor has previously taken a bad debt deduction or worthless security deduction with respect to the Creditor's claim. If the debt is not business related, a deduction is only available if the debt is worthless. A cash basis taxpayer can deduct a bad debt only if an actual cash loss has been sustained or if the amount deducted was included in income. All accrual-basis taxpayers must use the specific charge-off method to deduct business bad debts.

To the extent that a Creditor receives payment pursuant to the Plan in an amount in excess of the Creditor's adjusted tax basis in the claim to which payment relates, the excess will be treated as income or gain to the Creditor. A Creditor not previously required to include in its taxable income any accrued but unpaid interest on a claim may be treated as receiving taxable interest, to the extent the amount it receives pursuant to the Plan is allocable to such accrued but unpaid interest. A Creditor previously required to include in its taxable income any accrued but unpaid interest on a claim may be entitled to recognize a deductible loss, to the extent the amount of interest actually received by the Creditor is less than the amount of interest taken into income by the Creditor.

## IV. THE CREDITOR TRUST

### A. Creditor Trust Agreement

The Plan provides for the formation of a Creditor Trust as of the Effective Date, which shall be governed by the Creditor Trust Agreement substantially in the form filed with a Plan Supplement. The Creditor Trust shall receive all assets of the Debtors' Estates, excluding Transferred Assets, but including the Sale Proceeds, net of payment of the Allowed Bondholder Claim, and any Excluded Assets under the APA. The Creditor Trustee shall receive the Sale Proceeds free and clear of liens, claims and encumbrances except for funds to be held in the Secured Claims Reserve.

**B.      Appointment of Creditor Trustee**

Scott Davis, a Partner at Grant Thornton LLP, shall be appointed as the Creditor Trustee. Mr. Davis' professional bio is attached as Exhibit C to this Disclosure Statement.

**C.      Powers and Duties of the Disbursing Agent**

The Plan provides that the Creditor Trustee shall have the following powers and duties:

1.      To take control of, preserve, and convert to Cash property of the Estates, subject to the terms of the Plan;

2.      To investigate, prosecute and/or abandon all Causes of Action belonging to or assertible by the Estates, excluding all Avoidance Claims (it being expected that the Creditor Trustee would only bring a claim or Cause of Action after careful consideration of the costs and benefits, in light of the distributions otherwise to be made under the Plan);

3.      To review and object to Claims filed against the Debtors;

4.      To compromise all disputes, including all Causes of Action and Objections to Claims;

5.      To make distributions on account of all Allowed Claims consistent with the terms of the Plan, and if funds remain after treatment of all Allowed Claims in accordance with the Plan and satisfaction or reservation for all wind-down expenses, return the excess funds to Banner in accordance with the APA;

6.      To retain Persons and professionals to assist in carrying out the powers and duties enumerated pursuant to the Plan;

7.      To enter into contracts as necessary to assist in carrying out the powers and duties enumerated pursuant to the Plan;

8.      To hire employees and/or terminate current employees of the Debtors;

9.      To pay expenses incurred in carrying out the powers and duties enumerated pursuant to the Plan, including Professional Fees incurred after the Effective Date;

10.      To take all necessary actions to ensure that the corporate existence of the Debtors remains in good standing until entry of a final decree closing the Chapter 11 Cases;

11. To open and maintain bank accounts and deposit funds and draw checks and make disbursements in accordance with the Plan;

12. In general, without in any manner limiting any of the foregoing, to deal with the assets of the Estates or any part or parts thereof in all other ways as would be lawful for any Person owning the same to deal therewith; provided, however, that the investment powers of the Debtors, other than those reasonably necessary to maintain the value of the Debtors' assets and to further the liquidating purpose, are limited to the power to invest in demand and time deposits, such as short term certificates of deposit, in banks and other savings institutions, or other temporary, liquid investments, such as United States Treasury Bills; and

13. At the appropriate time, to ask the Bankruptcy Court to enter the final decree.

**D.** **Corporate Authority**

Under the Plan, from and after the Sale Closing, the Creditor Trustee will have all corporate authority for each of the Debtors entities to execute any documents or instruments necessary or appropriate post-Sale Closing and to take any other corporate action to wind up and dissolve the corporate entities.

**E.** **Compensation of Creditor Trustee and Professionals Retained by Him**

Under the Plan, the Creditor Trustee and any professionals retained by the Creditor Trustee are entitled to reasonable compensation at their standard rates. When seeking payment, the Creditor Trustee or the relevant professional shall provide a copy of the statement to Banner and the Master Trustee (if any amounts remain outstanding on the Bonds). If no written objection to the payment request is received within 10 days, then the sum requested shall be promptly paid. Any objection shall specify the amount objected to and reasons. If an objection is made, the undisputed amount shall be promptly paid. If the parties are unable to resolve any remaining disputes, the Bankruptcy Court shall resolve the dispute upon notice and a hearing.

**F.** **Post-Effective Date Statutory Fees**

All fees payable pursuant to 28 U.S.C. § 1930 incurred after the Effective Date shall be paid in accordance with applicable law.

### G. Post Confirmation Reports

The Creditor Trustee shall submit post-confirmation reports in accordance with applicable law.

### H. Exculpation

The Plan provides that neither the Creditor Trustee nor its designees, retained professionals or any duly designated agent or representative shall be liable for anything other than such Person's own acts as shall constitute willful misconduct or gross negligence in the performance (or nonperformance) of its duties, or acts contrary to the express terms of the Plan. The Creditor Trustee may, in connection with the performance of its functions, consult with counsel, accountants and its agents, and may reasonably rely upon advice or opinions received in the course of such consultation. If the Creditor Trustee determines not to consult with counsel, accountants or its agents, such determination shall not in itself be deemed to impose any liability on the Creditor Trustee, or its members and/or its designees. The Creditor Trust shall indemnify the Creditor Trustee for any and all damages, fees and expenses incurred in connection with these Cases or the Plan; except that the Creditor Trustee shall not be indemnified from damages, fees or expenses arising from its gross negligence or willful misconduct.

## V. PROCEDURES FOR RESOLVING AND TREATING CONTESTED CLAIMS

### A. Term of the Automatic Stay

The automatic stay provided for under section 362 of the Bankruptcy Code shall remain in full force and effect until the earliest of the time these Cases are closed or dismissed, as provided under section 362(c)(2) of the Bankruptcy Code.

### B. Objections to Claims and Settlements

After the Effective Date, Objections to Claims may be made, and Objections to Claims made previous thereto shall be pursued, only by the Creditor Trustee at his sole discretion. After the Effective Date, the Creditor Trustee may settle any Disputed Claim where the proposed Allowed Claim is to be less than $25,000 without notice and a hearing and without an order of the Bankruptcy Court. All other settlements shall be subject to notice and a hearing pursuant to §

1  102(1) of the Bankruptcy Code and a Final Order of the Bankruptcy Court approving the

2  settlement.

3  **C.**    **Reserves for Disputed Claims**

4  If any Claim is a Disputed Claim, no distribution shall be made on account of such Claim

5  unless and until said Disputed Claim becomes an Allowed Claim.  In the event a Distribution is

6  made while there is a Disputed Claim, the Distribution that would be paid on account of the

7  Disputed Claim shall be withheld and remain in the a bank account maintained in compliance

8  with Article VII of the Plan until the Claim is Allowed or Disallowed.  If the Claim is Allowed,

9  the Holder of the Allowed Claim will receive its withheld Distribution.

10  **D.**    **Other Provisions**

11  Additional provisions concerning Objections to Claims are described further in Article VII

12  of the Plan.

13  **VI.    MISCELLANEOUS PLAN PROVISIONS**

14  **A.**    **Waiver of Avoidance Claims**

15  The Plan provides that, upon the Effective Date and conditioned upon Sale Closing,

16  Avoidance Claims shall be deemed waived and abandoned.

17  **B.**    **Committee Dissolved**

18  The Committee, if one is appointed, shall be dissolved automatically and its members

19  shall be deemed released of all their duties, responsibilities and obligations in connection with

20  these Cases and the Plan.

21  **C.**    **Discharge**

22  Except as otherwise provided in the Plan, and irrespective of any prior orders of the

23  Bankruptcy Court or any other court of competent jurisdiction, effective as of the Confirmation

24  Date: (1) the rights afforded in the Plan and the treatment of all Claims and Membership Interests

25  in the Plan shall be in exchange for and in complete satisfaction, discharge and release of all

26  Claims and Membership Interests of any nature whatsoever, including any interest accrued on

27  such Claims from and after the Petition Date, or any of its assets, property or its Estates; (2) the

28  Plan shall bind all Holders of Claims and Membership Interests, regardless of whether any such

014855\0013\10999220.21

42

Holders failed to vote to accept or to reject the Plan or voted to reject the Plan; and (3) all Claims against and Membership Interests in the Debtors, and the Debtors in its capacity as debtor-in-possession, shall be satisfied, discharged and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including, without limitation, any liability of the kind specified under § 502(g) of the Bankruptcy Code; *provided, however*, that nothing in the Plan shall discharge any liabilities of the Debtors arising after the Confirmation Date or that is not otherwise a Claim within the meaning of § 101(5) of the Bankruptcy Code.

### D.  <u>Approval of Settlements and Releases</u>

In consideration of the subordination of the Allowed Bond Redemption Premium Claim and other consideration and benefits provided in the Chapter 11 Cases and under the Plan, the treatment of the Class 1 Allowed Bond-Related Claims, including releases and exculpations provided under the Plan, constitute a good-faith compromise and settlement of the Estates' Causes of Action and any and all Claims and Liens of the Bond Trustee, the Master Trustee, and the beneficial Holders of the Bonds, respectively. Entry of the Confirmation Order would constitute the Bankruptcy Court's approval of such compromise and settlement of all Causes of Action, and any and all Claims and Liens of the Bond Trustee, the Master Trustee, and the beneficial Holders of the Bonds pursuant to the Plan as well as a finding that such settlement is fair, reasonable and in the best interest of the Debtors and their Estates.

### E.  <u>Exculpation</u>

The Plan provides for the exculpation of the following parties (collectively, the "<u>Exculpated Parties</u>"): (i) the Debtors; (ii) the Master Trustee in any capacity; (iii) the Bond Trustee in any capacity; (iv) the beneficial Holders of the Bonds; (v) the members of the Committee, if one is appointed; (vi) Banner; and (vii) the current and former officers, directors, members, managers, employees, attorneys, advisors and any other Professionals, each in their respective capacities as such, of each of the foregoing.

Section 13.04 of the Plan provides that none of the Exculpated Parties shall have or incur any liability to any Person for any act or omission in connection with, related to, or arising out of these Cases, including, without limitation, the preparation, formulation or consummation of the

Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document entered into during the Chapter 11 Cases or otherwise created in connection with the Plan, the pursuit of confirmation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

Exculpation provisions, such as this one, are relatively common in Chapter 11 plans and have been approved by the Bankruptcy Court and others in the Ninth Circuit. *See, e.g., In re Transwest Resort Prop., Inc.*, Case No. 10-37134 (Bankr. D. Ariz. Dec. 30, 2011); *In re W. Asbestos Co.*, 313 B.R. 832, 846-47 (Bankr. N.D. Cal. 2003); *see also In re PWS Holding Corp.*, 228 F.3d 224, 245-46 (3d Cir. 2000) (affirming order confirming plan that contained provisions, similar to those in the Plan, exculpating and releasing claims against the debtors, the reorganized debtors, the creditors' committee, the creditors' representative and their respective members, directors, officers and professionals, finding such release provisions permissible, and stating that such release provisions are "***a commonplace provision in Chapter 11 plans***") (emphasis added).

The Debtors propose the exculpation provision because it furthers the purpose of finality and reducing variability of outcomes to creditors. Each of the Exculpated Parties made significant contributions prior to and during these Cases to achieve a Plan that provides for creditors to likely be paid in full or very close. The exculpation provision takes effect only if the Plan is confirmed and is consistent with acceptance and approval of the general Plan. Moreover, the exculpation provision benefits the estate and creditors because many of the Exculpated Parties may have rights of indemnification against the Debtors' estates in the event such actions were permitted and brought.

**F.    Releases**

The Plan provides for the release of claims by the Debtors against the following parties (collectively, the "Released Parties"): (i) the Master Trustee in any capacity; (ii) the Bond Trustee in any capacity; (iii) the beneficial Holders of the Bonds; (iv) the members of the Committee, if one is appointed; (v) Banner; and (vi) the current and former officers, directors, members,

managers, employees, attorneys, advisors and any other Professionals, each in their respective capacities as such. The specific release in the Plan is as follows:

**RELEASES BY THE DEBTORS.** ON THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION AND IN RETURN FOR THE COMPROMISES EMBODIED IN THE PLAN, THE RECEIPT AND ADEQUACY OF WHICH ARE HEREBY CONFIRMED, THE DEBTORS, ON BEHALF OF THEMSELVES AND THEIR ESTATES, THE REORGANIZED DEBTORS, AND THE CREDITOR TRUSTEE, SHALL BE DEEMED TO HAVE IRREVOCABLY RELEASED ANY AND ALL CLAIMS AND CAUSES OF ACTION, INCLUDING AVOIDANCE CLAIMS, AGAINST THE RELEASED PARTIES ARISING PRIOR TO THE EFFECTIVE DATE.

The Debtors believe that this release of claims against the Released Parties is necessary and appropriate, especially given the unique facts of these Cases. The causes of action being released are property of the Debtors' estates under section 541 of the Bankruptcy and their release is authorized under section 1123(b)(3)(A) of the Bankruptcy Code. Here, the Released Parties made significant contributions to these Cases and to a Plan that is anticipated to pay creditors in full. Released were a negotiated deal point for many of the Released Parties. *See, e.g.*, Disclosure Statement § VI.D.

Moreover, it is the Debtors' business judgment that there would be nominal, if any, benefit to creditors and the estates in preserving and pursuing causes of action against the Released Parties. Among other reasons, that is why Article X of the Plan provides that Avoidance Actions are deemed waived and abandoned as of the Effective Date. Moreover, because the Plan is anticipated to pay creditors in full, creditors would unlikely receive any benefit from the pursuit of such causes of action. To the contrary, the Debtors believe that investigating and pursuing these causes of action could distract from the goal of a quick sale and distribution to creditors and would lead to increased administrative expense claims, which, in turn, could actually reduce overall recoveries for creditors. Moreover, the Released Parties might assert counterclaims or indemnification claims in response to such litigation, which could further deplete funds otherwise available for distribution to creditors.

### G.    Other Provisions

Creditors and other parties in interest are directed to the Plan with respect to the provisions that are not specifically discussed in this Disclosure Statement.

### VII.    RISK FACTORS

As with any plan or other financial transaction, there are certain risk factors which must be considered. It should be noted that all risk factors cannot be anticipated, that some events will develop in ways that were not foreseen and that many or all of the assumptions that have been used in connection with this Disclosure Statement and the Plan will not be realized exactly as assumed. Some or all of such variations may be material. While every effort has been made to be reasonable in this regard, there can be no assurance that subsequent events will bear out the analysis set forth herein. Not all possible risks can be, or are discussed in this Disclosure Statement. Under the Plan, some of the principal risk that Holders of Claims should be aware of, in the Debtors' view, are as follows:

- <u>Risk Related to the Sale Closing.</u>  Banner's right to terminate the APA based upon results of due diligence expired on February 28, 2014, and Banner is proceeding towards the Sale closing under the APA.  Banner's commitment to purchase is subject to, among other things, state and federal regulatory approval.  The Federal Trade Commission has completed its review of the parties' required submission under the Hart-Scott-Rodino Act and has determined not to challenge the sale. The Arizona Attorney General has also completed and closed its premerger investigation.  The Day Act hearing, which provided for a state regulatory review process, was completed on March 13, 2014 and the required report from the hearing was issued March 17, 2014. The Arizona Corporate Commission has confirmed receipt of the summary report of the public hearing, thus satisfying A.R.S. §10-11253.  Banner is financially strong and its ability to perform is not considered to be a material risk.

- <u>Dilution of Distributions Based on Allowed Claims</u>  The Claims Bar Date has not yet passed and to the extent there are additional claims filed before the Bar Date,

014855\0013\10999220.21

46

the amount of Allowed Claims may increase, subjecting the Holders of Allowed Claims to the risk of dilution. Additionally, no final determination has been made as to which Claims will be Disputed Claims, and it is possible that the number of Disputed Claims may be material and that the amounts allowed in respect of such Disputed Claims may be materially in excess of the estimates of Allowed Claims used to develop the Plan and this Disclosure Statement. The Holders of Allowed Claims are subject to the risk of dilution if the amount of actual Allowed Claims exceeds such estimates. Accordingly, distributions to the Holders of Allowed Claims are at risk of being adversely affected by the total amount of Allowed Claims. Factors that may cause Allowed Claims to exceed projected amounts include claims arising from contract rejections, unknown claims and liabilities, or differences in books and records between the Debtor and the relevant Creditor.

- <u>Costs of Administering the Estate</u> The disbursement of the proceeds of any litigation recoveries will require certain administrative costs that may vary based on a variety of factors. Such administrative costs cannot be predicted with certainty and will be paid from cash on hand. Accordingly, such expenses may affect recoveries under the Plan, in particular if the Creditor Trustee elects to pursue any litigation.

- <u>Hospital Operations</u>. The estimated payouts on Allowed Claims assumes that the Debtors will operate the hospital at certain levels of profit and loss. If the Debtors' performance is below those projections, return to Creditors could be diminished.

- <u>Adjustments to Purchase Price</u>. The APA provides for certain adjustments to the Purchase Price. If these adjustments reduce cash proceeds of sale, payouts to Creditors would be affected accordingly.

# VIII.   ALTERNATIVES AND POTENTIAL PLAN RECOVERY

## A.   Chapter 7 Liquidation

An alternative to confirmation of the Plan would be liquidation of the Debtors' assets by a trustee appointed in a case under Chapter 7 of the Bankruptcy Code.  In that event, a trustee would be appointed to liquidate the assets of the Debtors for distribution to holders of Claims and Membership Interests in accordance with the priorities established by the Bankruptcy Code. The Chapter 7 trustee would make all of his or her own decisions with respect to the liquidation of the Estate, the hiring of professionals, the pursuit of any claims or litigation, and the payment or objection to Claims.  If a Chapter 7 trustee were appointed, the Chapter 7 trustee would be paid pursuant to the provisions of § 326(a) of the Bankruptcy Code, which would add an additional Administrative Expense Claim.

Under § 1129(a)(7), a debtor's plan must provide that creditors receive no less under the plan that they would in a liquidation scenario under Chapter 7. Such analysis is unusually hypothetical in these Cases because the Debtors are non-profit entities and not "moneyed, business, or commercial corporation[s]" and, as such, their Cases cannot be converted to Chapter 7 without their consent. 11 U.S.C. §1112(c). *See also In re Hyperion Foundation, Inc.*, 2009 WL 2477392 (holding that 11 U.S.C. § 1112(c) bars conversion of non-profit debtor with the charitable purpose of operating nursing homes and related healthcare facilities); *In re Hospital de Damas, Inc.*, 2012 WL 1190651 at n.1 (noting that a non-profit hospital is not eligible to be converted to Chapter 7 under 11 U.S.C. § 1112(c)).

Nevertheless, Debtors have included a hypothetical liquidation analysis attached hereto as Exhibit D (the "Liquidation Analysis").  As more fully demonstrated in the Liquidation Analysis, the Debtors believe that Confirmation of the Plan will provide each holder of a Claim entitled to receive a distribution under the Plan with a recovery that is not less than it would receive if the

1  Debtors were liquidated under Chapter 7 of the Bankruptcy Code.  For instance, the average

2  recovery for Secured Claims under the Plan is 100%, whereas under a liquidation scenario

3  Secured Claims are estimated to recover anywhere from 13.3% to 39.2%.  Similarly, Unsecured

4  Claims are estimated to recover on average 100% under the Plan and 0% under a liquidation

5  scenario.

6
        The Debtors submit that the Banner Transaction pursuant to the terms of the Plan is in the

7  best interest of Creditors. A Chapter 7 trustee would not be able to operate a hospital.  As a result,

8  the Banner Transaction would be unavailable and assets would be sold at liquidation values.  The

9  Banner Transaction provides value far in excess of liquidation values.

10
        **B.**      **Alternative Plan**

11
        If the Plan is not confirmed as to one or more Debtors, one or more Debtors (or if the

12  Debtors' exclusive period in which to file a plan or plan of reorganization has expired, any other

13  party in interest) may be entitled to file a different plan.  However, the Debtors believe that the

14  proposed Plan provides holders of Claims and Interests with the greatest value possible under the

15  circumstances.  The Debtors believe that any subsequently-proposed plan would likely provide a

16  less favorable treatment than the Plan by further delaying distribution, resulting in additional

17  expense.  Moreover, the Debtors do not believe that they can propose an alternative plan without

18  additional capital, no known source of which is available, and for other reasons believe that a sale

19  is in the best interests of creditors and the community the Debtors serve.  A sale pursuant to an

20  alternative plan would be subject to the risks described in Section VII of the Disclosure Statement

21  under "Risks Related to Sale Closing."

22
        **C.**      **Dismissal of Bankruptcy Case**

23
        The Debtors do not believe that dismissal of the Bankruptcy Case would be to the

24  advantage of parties in interest.

014855\0013\10999220.21                              49

March 28, 2014

Debtors and Debtors-in-Possession

By: _s/_ _Ilona Cunphry_

Title: Chief Executive Officer

APPROVED AS TO FORM:

Michael McGrath Az. #6019
Kasey C. Nye Az. #20610
**MESCH, CLARK & ROTHSCHILD, P.C.**
259 North Meyer Avenue
Tucson, Arizona 85701
Telephone: 520.624.8886
Facsimile: 520.798.1037
Email: mmcgrath@mcrazlaw.com
       knye@mcrazlaw.com

AND

Michael J. Pankow (Co. # 21212)
Joshua M. Hantman (Co. # 42010)
**BROWNSTEIN HYATT FARBER SCHRECK, LLP**
410 Seventeenth Street, Suite 2200
Denver, CO 80202-4432
Telephone: 303.223.1100
Facsimile: 303.223.1111
Email: mpankow@bhfs.com
       jhantman@bhfs.com

*Attorneys for Debtors-In-Possession*

**ATTACHMENTS TO AMENDED DISCLOSURE STATEMENT**

EXHIBIT A:     The Plan

EXHIBIT B:     The Budget

EXHIBIT C:     Professional Bio of Scott Davis

EXHIBIT D:     Liquidation Analysis